Ronald NOVAK, individually and on behalf of all others similarly situated, and Fred Cruz, Petitioners-Appellants,

v.

Dr. George J. BETO, Director of the Texas Department of Corrections, Respondent-Appellee.

No. 31116.

United States Court of Appeals, Fifth Circuit.

Dec. 9, 1971.

Rehearing and Rehearing En Banc Denied March 8, 1972.

Tuttle, Circuit Judge, concurred in part and dissented in part and filed opinion.

---

William Bennett Turner, San Francisco, Cal., Frances T. Freeman Jalet, Houston, Tex., for petitioners-appellants.

Mario G. Obledo, Gen. Counsel, San Francisco, Cal., for Mexican American Legal Def., amicus curiae.

Harrell Moore, Larry J. Craddock, Asst. Attys. Gen., Austin, Tex., for respondent-appellee.

Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellants are inmates in custody of the Texas Department of Corrections. In this class action brought under 42 U.S.C.A. § 1983 they challenge the constitutionality of various aspects of the treatment accorded them by the Texas prison system. Specifically at issue is whether the Texas Department of Corrections (TDC) regulation banning all inmate assistance in the preparation of writs of habeas corpus and other legal work is, under the teaching of Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1968), unconstitutional even though what appellee contends to be reasonable alternatives are in existence; whether the loss of statutory good time by those who have violated this regulation is justified; and whether, in light of the special circumstances peculiar to Death Row inmates, the regulation, at least as applied to them, is unconstitutional. In addition, appellants attack the conditions of solitary confinement as administered in Texas as constituting "cruel and unusual punishment" in vio-

lation of the Eighth and Fourteenth Amendments.

The district court, 320 F.Supp. 1206, found against appellants on all of these issues. We conclude, however, that in light of Johnson v. Avery, *supra*, and Beard v. Alabama Bd. of Corrections, 5th Cir. 1969, 413 F.2d 455, the legal assistance regulation in question cannot stand. We affirm the district court's holding that solitary confinement as administered in Texas is not unconstitutional.

### Inmate Assistance

In Johnson v. Avery the Supreme Court held that Tennessee could not constitutionally ban fellow-prisoner assistance in the preparation of habeas corpus petitions so long as the state provided prisoners with no alternative assistance, since such a regulation effectively denied indigent, illiterate prisoners any access to the courts. As the Court stated:

> There can be no doubt that Tennessee could not constitutionally adopt and enforce a rule forbidding illiterate or poorly educated prisoners to file habeas corpus petitions. Here Tennessee has adopted a rule which, in the absence of any other source of assistance for such prisoners, effectively does just that.

The Court went on to notice that many states had alternative programs to supply legal assistance to prison inmates although it did not express its judgment concerning these plans. The Court did note their existence and indicated that "techniques are available to provide alternatives if the State elects to prohibit mutual assistance among inmates." Johnson v. Avery, 393 U.S. at 490, 89 S.Ct. at 751.

It is undisputed that Texas prison officials prohibit any form of legal assistance by one inmate to another. Appellees argue, however, that they have provided appellants with reasonable alternatives to inmate assistance and thus are in compliance with Johnson v. Avery. In examining these alternatives, the trial court noted:

The department provides at each of its units a "writ room," available each week during specified hours and in which an inmate must perform all his legal work. A small "library" is available there, and respondents have recently directed that prisoners be allowed to utilize the law books of fellow inmates as well as those maintained by the State. An extensive legal manual, composed in layman's language, will soon be available in the writ room and prison libraries to assist inmates in the preparation of petitions. In addition, prisoners may freely correspond with legal service organizations.

\* \* \* \* \* \*

In September, 1969, the prison system employed an attorney, Mr. Harry Walsh, whose sole responsibility is the provision of legal assistance to inmates. Mr. Walsh testified that another full time attorney is now on the prison staff; that three senior law students were employed at the prison during the summer of 1970; and that law students may soon be available for inmate assistance throughout the year.

Clearly, the TDC has been making progress toward complying with the dictates of Johnson v. Avery and Beard v. Alabama Bd. of Corrections, *supra*, in which this Court said:

> A regulation prohibiting the granting of assistance altogether might well be sustained if the state were to make available a sufficient number of qualified attorneys or other persons capable and willing to render voluntary assistance in the preparation of petitions for habeas corpus relief. *Beard*, 413 F.2d at 457.

Nevertheless, after studying the record carefully, we are unable to conclude, as the district court did, that the State carried the burden of proving that it provided at the time of trial a reasonable alternative to inmate legal assistance. The State has failed to convince us that its effort was sufficient.

Many questions were left unanswered by the State that would have been rele-

vant to our inquiry into the adequacy of the State's alternatives to inmate assistance. For instance, we would have been interested to know how many of the approximately 12,000 prisoners in the TDC expressed a need for legal assistance in seeking post conviction relief. There is vague testimony that only a small number of the total prison population actually are interested in seeking post conviction relief, but that testimony was insufficient to present any clear picture of the magnitude of the problem. Additionally, we would have been interested to know how much time is required to handle each prisoner's file. It might be, for example, that many of the complaints concern rather routine matters that could be handled adequately in an hour's time. If this were the case, the fact that a single attorney handled 1300 files his first year might be less striking. Moreover, the hiring of a second attorney and three summertime law students should have relieved the situation considerably, but we were given very little specific information as to what degree, if any, the situation was relieved. Finally, we were told nothing specific about what amount of outside legal assistance in the form of legal aid and public defender programs might be available to prisoners. Johnson v. Avery appears to invite states to utilize such outside help in providing alternatives to inmate legal assistance.

■ What we have concluded, in short, is that although we cannot be certain from this record that the TDC has *not* provided a reasonable alternative to inmate legal assistance, neither can we be certain that the TDC *has* provided the requisite alternative. And since we think Johnson v. Avery places the burden of justifying its regulation against inmate legal assistance on the State, we must conclude that the State so far has failed in carrying that burden.

■ Having found that the State has failed to prove that it has provided a reasonable alternative to inmate assistance, we feel we should offer some guidance for future State action. We would re-

quire the State to carry the burden of justifying its regulation against inmate assistance by producing evidence that establishes *in specific terms* what the need is for legal assistance on habeas corpus matters in the TDC, and by demonstrating that it is reasonably satisfying that need. In defining the need for assistance and in responding to the need, TDC should give special consideration to the high illiteracy rate of the inmates, to the fact that a substantial number are Mexican-Americans who speak little English, and to the great geographical dispersion of the Texas correctional facilities. We would permit the state to draw upon any source of assistance available, whether it be voluntary or remunerated, and whether it be licensed or unlicensed to practice law, as long as that service could be systematically relied upon. We think the record in this case demonstrates that TDC has been making a substantial effort since Johnson v. Avery to provide a reasonable alternative to inmate legal assistance. The TDC could not, of course, develop a complete legal assistance program overnight. As soon, however, as the TDC has developed an alternative to inmate assistance that it feels would be acceptable to this Court, it will of course be free to return to court to seek approval of that alternative.

■ Because we are not convinced that Johnson v. Avery has been complied with in this case, we hold that the loss of good time suffered as a result of violating the regulation against inmate assistance must be restored to appellants.

Appellants also set forth the peculiar difficulties of Death Row prisoners in obtaining legal assistance. Some of the services performed by the "writ writers" included assisting Death Row prisoners obtain stays of execution. Because what we have decided regarding prisoners in general is applicable to those on Death Row, it is not necessary to examine their arguments separately.

### Solitary Confinement

■ In view of recent tragic incidents in this Nation's prisons and of

the frequent assertions of the inadequacy of our penal systems, the burden of judging weighs upon us more than usual as we turn to appellants' contention that solitary confinement as administered by the TDC is cruel and unusual punishment. Just as our dissenting brother, we are deeply troubled by the lightless cell, the limited bedding, and the minimal food provided prisoners in solitary confinement in Texas. Nevertheless, we do not find that the imposition of these conditions constitutes cruel and unusual punishment as forbidden by the Eighth Amendment. As judges, we must look to the extant law and the general practices of our society. Otherwise, we run the risk of imposing our own personal moral code on a perhaps unready society.[1]

We begin by turning to the long line of cases, to which we have found no exception, holding that solitary confinement *per se* is not "cruel and unusual." Sostre v. McGinnis, 2d Cir. 1971, 442 F.2d 178; Burns v. Swenson, 8th Cir. 1970, 430 F.2d 771; Courtney v. Bishop, 8th Cir., 409 F.2d 1185, cert. denied, 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969); Graham v. Willingham, 10th Cir. 1967, 384 F.2d 367; United States ex. rel. Knight v. Ragen, 7th Cir. 1964, 337 F.2d 425, cert. denied, 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277 (1965). Our inquiry does not, however, end here since appellants challenge solitary confinement as implemented by the TDC. We must, therefore, examine the particular conditions that existed in each system previously scrutinized by the courts. Holt v. Sarver, E.D.Ark.1969, 300 F.Supp. 825. On the question of particular conditions, there are several cases that have concluded that certain prison conditions were so "base, inhuman and barbaric" that they violate the Eighth Amendment. We have studied these cases and the conditions depicted therein rather carefully, and find in none of them support for condemnation of solitary confinement in this case. In the first place, there is a common thread that runs through all these cases and that is not present in our case. That thread is the deprivation of basic elements of hygiene. *See, e. g.*, Wright v. McMann, 2d Cir. 1967, 387 F.2d 519 [complaint alleged cell encrusted with excrement, plaintiff entirely naked, forced to sleep on concrete floor, windows open throughout subfreezing weather, no soap, towel or toilet paper]; Hancock v. Avery, M.D.Tenn.1969, 301 F.Supp. 786 [hole for waste, flushed irregularly by guard, no soap, towel or toilet paper, prisoner slept naked on floor]; Holt v. Sarver, supra [isolation cells dirty and unsanitary, pervaded with bad odors, plain cotton mattress uncovered and dirty; conducive to spreading, and did spread, infectious diseases]; Jordan v. Fitzharris, N.D.Cal. 1966, 257 F.Supp. 674 [cells not cleaned regularly, prisoner had no means to clean himself, a hole for receiving bodily wastes, no flushing mechanism]. By contrast with these cases, the prisoners in the TDC solitary confinement cells are deprived of none of the basic elements of hygiene. It is uncontradicted that solitary cells are scrubbed by the guards each time the prisoner leaves to bathe, which occurs at least three times a week. The cells are identical to the regular cells of the TDC in size and facilities; they contain flush toilets, a drinking fountain, and a bunk. The prisoner is supplied with toilet paper,

---

1. On this point, we share the views of Judge Kaufman of the Second Circuit, writing for the majority of that Court *en banc*, in Sostre v. McGinnis, 2d Cir. 1971, 442 F.2d 178, at 191, who stated:

[e]ven a lifetime of study in prison administration and several advanced degrees in the field would not qualify us *as a federal court* to command state officials to shun a policy that they have decided *is suitable because to us the* choice may seem unsound or *personally* repugnant. As judges we are obliged to school ourselves in such objective sources as historical usage . . . ., practices in other jurisdictions . . . and public opinion, . . . before we may responsibly exercise the power of judicial review to declare a punishment unconstitutional under the Eighth Amendment. (Emphasis in original)

a toothbrush and toothpaste. Although the bunk is stripped in the sense that it has no mattress or pillow, the prisoner is given two blankets and is clothed in a gown or other garb, so that there is nothing to compare with the reports of prisoners sleeping naked on concrete floors in the above-cited cases. In addition, solitary cells in the TDC have the same temperature controls that regular cells in the prison have. We think it is correct to say, therefore, that no case has found conditions comparable to those in the TDC unconstitutional.

More important, most of the conditions challenged by appellants have withstood scrutiny by other courts,[2] and are to be found in differing variations in almost every jurisdiction in the country. *See* Sostre v. McGinnis, *supra,* 442 F.2d at 193.

Finally, the TDC has been ranked second or third among the Nation's prisons for its progressiveness in prison administration and reform. This, to us, should be a weighty fact in any evaluation of the TDC under the cruel and unusual punishment clause.[3]

We would not put so much stock in the TDC's fine reputation if we did not find

that reputation borne out by the record in this case. The impression we have of the TDC from this record is that it has progressed rapidly under Dr. Beto's administration, and that it engages in constant efforts to reform and to police itself. We think this may be demonstrated by a description of the TDC's policy with respect to solitary confinement. This policy is set out in a TDC memorandum of "Disciplinary Procedures" directed to all wardens from the TDC's Assistant Director for Treatment. It appears in the Record as defendant's exhibit D–14. As we understand the testimony in this case, this memorandum is modeled after, and complies substantially with, the American Correctional Association's Manual on Correctional Standards. The most effective way to reveal the thrust of the memorandum, which is 23 pages long, is to quote certain passages from it:

*"Preventive Discipline*

The capable and experienced official resolves most problems before they occur. He constantly corrects conditions that cause bitterness and unrest. He 'spots' and segregates ringleaders and agitators who foment trouble.

2. In Ford v. Board of Managers, 3d Cir. 1969, 407 F.2d 937, for example, a bread and water diet supplemented by a regular meal each third day withstood the scrutiny of a federal court. *See also* the conditions described in Krist v. Smith, S.D. Ga.1970, 309 F.Supp. 497, aff'd, 5th Cir. 1971, 439 F.2d 146. The dissent has cited conditions in federal solitary confinement as favorable by comparison. We would point out, however, that the federal practice is to leave prisoners in solitary confinement *indefinitely. See* Sostre v. McGinnis, 2d Cir. 1971, 442 F.2d at 193. Moreover, while federal prisoners in solitary have light in their cells and a mattress on their bunks at night, their cells are stripped during the day and they have only a floor toilet. Moreover, as we understand the testimony in this case (there is some confusion between administrative segregation and punitive confinement throughout the record), the federal prisoners in solitary received a "bland loaf." Dr. Beto testified that the prisoners in the TDC had expressed a preference for bread and

water as opposed to the federal loaf. In short, while it seems that no two systems are alike, they all use variations of the same theme.

In addition, there is testimony that the main reason for the differences between the federal and state facilities is that federal prisons contain fewer persons who are in on assault and murder charges. The state prisons have more need to adopt measures designed to cope with inmates prone to violence. This appears to be the reason inmates in the TDC are usually given a thin gown rather than a full prison uniform when they go to solitary. Apparently, there was reason to believe that the inmates in solitary would use the heavier clothing to attack the guards or to stuff the toilet, causing it to flood.

3. We find this fact particularly persuasive in light of the Supreme Court's tendency to strike down a choice of punishments "only when the penalty is authorized in almost no other civilized jurisdiction." *See* Sostre v. McGinnis, *supra,* at 193, note 22.

\*   \*   \*   \*   \*   \*

Preventive discipline consists of effective initial orientation . . . and continuing group and individual instruction . . . with a view to preventing a repetition of deviation without the necessity of taking punitive action. These correction techniques should be employed when trivial deviation occurs due to ignorance or lack of understanding, or when resulting from carelessness or faulty habits. In many instances a word of caution or instruction, an expression of genuine interest in the conduct of an inmate may show the subject how to avoid future errors. \*   \*   \*"

The Memorandum then describes at great length the Disciplinary Procedures utilized in the TDC. These procedures include an initial report containing not only the correction officer's statement of the offense charged, but also the inmate's version of the offense; a hearing before the Unit Disciplinary Committee, at which the inmate is read the charge against him, and is given an opportunity to state his case; and, finally, the procedures require that the Committee give a statement explaining what action it has taken and why. Once there has been a decision to discipline an inmate for a rule infraction, the Disciplinary Committee may choose from among several disciplinary measures. The Memorandum instructs those administering discipline *"to use only as much punishment as will effect the necessary change in the individual's conduct."* The list of disciplinary procedures include

"A. Counsel or Reprimand.

B. Loss of Privileges [deemed one of the most effective methods of controlling the prisoner's behavior]—Includes such measures as loss of recreation time, commissary privileges, movies, T. V. and other leisure time activities. States the Memorandum, 'It is usually not advisable to restrict the inmate's letter writing privileges unless the offense is in violation of the regulations relating to these practices.'

C. Negative Points—Possession of points creates eligibility for promotion and ultimately for pardon and parole.

D. Suspended Sentence—Imposition of Penalty is suspended contingent upon further good conduct.

E. Extra Duty—Inmate is assigned extra duty labor on Saturday and during leisure hours.

F. Demotion in Class—Involves loss of trusty status, etc.

G. Loss of Overtime or Good Time.

H. Segregation—This includes administrative and punitive segregation."

Since Punitive Segregation is what concerns us here, we think it would be helpful to set out substantially the TDC's entire procedure. The instructions begin with the following caveat:

"Punitive segregation is ordinarily used as punishment when reprimands, loss of privileges, suspended sentences, and similar measures have been tried without satisfactory results. Punitive segregation is a major disciplinary measure and should be used judiciously when all other forms of action prove inadequate, where the safety of others is concerned, or when the serious nature of the offense makes it necessary."

Then, after describing the more lenient forms of Punitive Segregation (which include restriction to one's cell with loss of privileges and a limited diet), the Memorandum sets out procedures to be followed in administering solitary confinement.

*"Solitary Confinement:*

Confined inmates in a punishment status, placed on a restricted diet, with loss of privileges and placed in special facilities for a comparatively brief period. Ordinarily no inmate should be retained in punishment segregation on restrictive diet more than 15 days, *and normally a shorter period is sufficient.* Punitive segregation is not for indefinite or permanent segregation.

A. Punitive segregation procedures

(1) Period of confinement:

Fifteen days should be the maximum time spent in solitary.

Recalcitrant inmates at the end of this period should be taken out of solitary, placed in a cell or if dormitory residents, left in cell with door open. After two or three days, depending upon physical condition, he may be returned to solitary and the procedure continued.

(2) Diet

A. Inmates in solitary are to be fed one slice of bread twice a day and are to be given unlimited drinking water.

B. Each 72 hours inmates are to be fed a full meal. The meal shall be identical to the meal on the steam table at that time for the working inmates, i. e., seasoned foods, salad, meat, dessert, drink.

C. If an inmate remains recalcitrant at the end of a 15-day period and is handled as defined above, he should be fed the regular full ration (three full meals) for a minimum of two days. The number of days he is fed full ration in his cell should be determined by physical condition and rapidity of strength renewal. When returned to solitary, restricted diet procedure will be in force.

(a) Written records should be made regarding date and time of feeding, and menu fed.

(3) Medical Care and Procedure

A. Inmates who are to be placed in solitary should be checked by a physician or medical officer prior to confinement. In the event neither is available, the medical classification should be carefully checked on the travel card, if medical classification is such that life will not be jeopardized, the inmate may be placed in solitary and checked by medical personnel at first available period. When there is doubt regarding health, the inmate should be placed in administrative segregation until evaluated by medical personnel. Diabetics, Epileptics, heart cases, cases of high blood pressure, ulcers, generally debilitated conditions should not be placed in solitary but all privileges may be denied to them and they may be confined in a hospital or clinic cell.

B. Inmates should be weighed at least once a week and more often if possible by medical personnel, written record reflecting weight should be kept either on solitary cell door, treatment card, or in a book reserved for this purpose.

C. All inmates in solitary must be checked by a physician or medical officer at least once a day. Written record of visit should be kept on treatment card or in a book reserved for this purpose.

D. Personal hygiene should be encouraged. Inmates should be given a bath at least three times a week. Inmates should be allowed to brush their teeth daily. Male inmates should be shaved twice a week.

(4) Clothing

Inmates in solitary confinement should be given coveralls, a gown or some other form of clothing, i. e., tee shirt and undershorts, tee shirt and regulation trousers. Changes of clothing shall be effected at least two times per week.

\*     \*     \*     \*     \*     \*

(5) Bedding

\*     \*     \*     \*     \*     \*

Inmates in punitive segregation, solitary, should be furnished with the necessary number of blankets to keep them warm.

\*     \*     \*     \*     \*     \*

(6) Visits to Segregation

Prisoners in punitive segregation will be visited, observed, or evaluated a minimum of:

A. Two times each shift by a correctional officer.

B. Daily by both the officer in charge of the day shift and the officer in charge of the night shift.

C. Daily by medical personnel.

D. As frequently as necessary by Disciplinary Committee members to assure inmate's welfare is properly provided for and to determine time and method of release.

E. Daily by either warden or assistant warden.

(7) Release from Punitive Segregation

Disciplinary Committee members will frequently review the case of each inmate in punitive segregation, determine the inmate's attitude, and return the inmate to the regular inmate population when, in the Committee's opinion, he may reasonably be expected to adequately adjust and conform to the rules and regulations. *Segregation for punishment should always be for the shortest period of time that will accomplish the desired results of favorable adjustment.*

(8) Return to Work

After a man has been in solitary over an extended period, he will become weak and in no condition to do a hard day's work. He should be treated as a 'new inmate' and given a light but productive work assignment until his strength returns, this will vary according to the individual and his work assignment.

EXERCISE CAUTION SO THAT HEALTH IS NOT JEOPARDIZED.

After studying this record in its entirety, we have found ample evidence to establish that the TDC complies with virtually all of these guidelines in its administration of solitary confinement. First, there are statistics in the record to show that the ratio of the average number of male inmates confined to solitary on a given day to the average total inmate population over a period of one year runs around 2.1%, indicating that solitary is indeed used sparingly. Secondly, there are computerized reports kept on all inmates who are confined to solitary. These reports record, among other things, the duration of the inmate's stay in solitary. They reveal that of the 132 prisoners confined in solitary at the time the reports were compiled, one had been in for a 14-day period, and 35 had been in for 7 days or more. The remaining 96 had been in for 6 days or less. Of the 11 who were let out on the day this report was compiled, 2 had been in for a full fifteen-day period, one had been in for one day only, 4 had been in for 6 days or less, and the remaining 4 had been in for 8–14 days. In addition, another yearly report showing the history of solitary confinement in the TDC revealed that most of those who had been confined were confined only once (in other words, the treatment was not repeated), while no more than 10% were returned after a second treatment for further periods of confinement. These reports convince us that solitary confinement is used sparingly in the TDC, that the period of confinement seldom equals the maximum fifteen-day period and is frequently well under that period, and that comparatively few of the prisoners in the TDC who are confined to solitary once have the punishment repeated a second time, and many fewer have it repeated a third time.

We turn now to the named prisoners who instituted this suit and who testified to their complaints about solitary confinement in the TDC. We think it should first be pointed out that each of the prisoners who testified came from the Ellis Unit, which is the TDC's maximum security unit where prisoners considered to be high security risks are housed. Each of them had compiled rather long records of non-conformity with prison rules. A brief sampling follows: The Appellant Brown had on his record two attempted escapes, two charges of possessing contraband [a knife in both instances], numerous charges of agitation, fighting, creating a disturbance, disobeying a direct order, not working properly, and stealing. Appellant Brassell had compiled an offense record which also included an attempt to escape, refusal to work and insolence. Appellant Cruz' record contains such of-

fenses as refusal to work, insubordination, threatening the life of another inmate, impudence, possession of a prohibited weapon and agitation.[4]

The confinement of each of these prisoners for violation of the prison regulation against inmate legal assistance should be viewed in the context of their entire records, and not as though this was the only offense they ever committed. It seems fair to say that the prison authorities might have concluded that these were prisoners *upon whom all lesser forms of discipline had failed.*

We have set out the above information in detail because it is important to view the use of solitary confinement in the TDC in the context of the whole prison system. We cannot view such conditions as a bread and water diet supplemented every 72 hours by a full meal in a vacuum. We must also take into account the fact that the prison authorities as a matter of policy are careful to limit use of the diet to avoid damage to the prisoner's health. Thus, as we consider each of the conditions in solitary, we must keep in mind that solitary is imposed as a last resort to obtain obedience from recalcitrant prisoners, that it is imposed for a limited amount of time [indeed, as we understand the testimony in this case, a prisoner will be released from solitary any time he asks to be released and agrees that he will abide by the prison rules], and that precautionary measures are taken to protect the prisoner from an overdose of solitary.

Used in this manner, solitary confinement serves a legitimate purpose in the prison community as a deterrent and a punitive force. Both the testimony of the prisoners in this case and the statistics revealing the low rate of returns to solitary support the conclusion that solitary is an effective deterrent of nonconforming prison conduct. On this point, we differ with the dissent, which concludes that solitary "has a totally nega-

tive impact on any hope for rehabilitation." First, we would point out that while there is testimony by one psychologist that solitary confinement has no rehabilitative value, this testimony was contradicted by a psychiatrist who stated that often belligerent prisoners need to be segregated temporarily for their own good, as well as for the protection of others. In fact, the experts testified that there is an ongoing debate in their field over the harmful vis-a-vis the helpful effects of solitary confinement. See Sostre v. McGinnis, *supra,* 442 F.2d at 193, n. 25. There is also, of course, a vigorous debate over the comparative roles of punishment and rehabilitation in the correctional stage of our criminal justice system. It is not our place, however to resolve that debate. We think it is enough simply to say that, as of now, deterrence and punishment still have an active place in our prisons. It is beyond dispute, of course, that order must be maintained in the prisons. And when a prisoner continues to break prison rules even after losing such privileges as going to the movies and being assigned extra work, the authorities must have some harsher measure to induce compliance with prison regulations.

Our role as judges is not to determine which of these treatments is more rehabilitative than another, or which is more effective than another.[5] The Constitution does not answer such questions. The scope of our review is very limited under the cruel and unusual punishment clause. And there are good reasons for the limitations on the scope of that review. In the first place we simply are not qualified to answer the many difficult medical, psychological, sociological, and correctional questions when it comes to choosing between one form of treatment and another. It is for this reason, we think, that courts have traditionally confined their review of prison regulations to such standards as "barbarous" and "shocking to the con-

---

4. Appellant Cruz is not a stranger to this Court. *See, e. g.,* Cruz v. Beto, 5th Cir. 1971, 445 F.2d 801.

5. *See* note 1 *supra.*

science." *See* Church v. Hegstrom, 2d Cir. 1969, 416 F.2d 449. *See also* Royal v. Clark, 5th Cir. 1971, 447 F.2d 501 ("Federal courts will not interfere in the administration of prisons absent an abuse of the wide discretion allowed prison officials in maintaining order and discipline, . . ."). More important, however, we think it is apparent from our experience with this case, if it had not been apparent before, that courts simply are not equipped to police the prisons.[6] There was testimony in this record, for example, that the prison medical officers did not always check on the prisoners in solitary. We cannot, however, condemn the whole system because the prison personnel deviate occasionally from the prison policy. Obviously, we cannot follow the medical officers on the rounds each day to see that they comply with their assigned duties. While we are not so naive as to believe that every prison employee obeys prison regulations to the letter, we believe that, absent a showing of bad faith on the part of prison officials, we must rely on the prison administrators to enforce the policies they adopt. We think it is clear from the record that Dr. Beto is doing a creditable job in this respect. He testified that he makes the rounds of all 14 units in the TDC weekly to see that prison policy is being followed by the wardens and guards. He interviews the prisoners to be sure they are treated fairly, and has instituted a rotation plan for his wardens, so that one authority does not remain in one unit over too long a period of time.

Viewing the record as a whole, therefore, we have concluded that solitary confinement as it is used in the Texas Department of Corrections does not violate the cruel and unusual punishment clause. In reaching this conclusion, we have compared the TDC's practices with those of other prison systems. We have considered that solitary is used sparingly and only as a last resort to inducing compliance with prison regulation. We have considered the fact that the authorities as a matter of prison policy take many precautionary steps to see that the use of solitary does not result in harm to the prisoners. On this record we cannot conclude that the TDC's system is cruel and unusual, much less barbarous or shocking to the conscience.

Affirmed in part, reversed in part.

TUTTLE, Circuit Judge (concurring in part and dissenting in part):

Although I agree with the majority, in so far as it holds that TDC's ban against inmate assistance cannot stand, I do so because I am convinced that this record *affirmatively shows* that the TDC has not supplied a reasonable alternative rather than because of the failure of the TDC to make a sufficient showing. The best illustration of this is the circular published by the prison authorities themselves. In part, this states:

". . . The lack of education and financial status of the average inmate prevents seeking 'outside' legal assistance. Therefore, the inmate is relegated to fighting for his rights unaided by legal counsel—*a very difficult task.* The hope is that the Inmate Attorney can, now supplement the inmates' own efforts. . . . (emphasis in the original)."

\* \* \* \* \*, \*

". . . Due to the Attorney's vast caseload, his access to each and every inmate will be limited . . . .

6. The limits of our ability to police the prisons manifests itself in various ways. One, of course, is the fact that prison reform is primarily a task for legislators and administrators. We cannot express this point better than did Judge Kaufman in Sostre v. McGinnis, *supra*, 442 F. 2d at 205 :
   We do not doubt the magnitude of the task ahead before our correctional systems become acceptable and effective from a correctional, social and humane viewpoint, but the proper tools for the job do not lie with a remote federal court. The sensitivity to local nuance, opportunity for daily perseverance, and the human and monetary resources required lie rather with the legislators, executives, and citizens in their communities.

. . . *Because of the illiteracy problem*, this book will solve no problems *unless the inmate has an understanding of the contents of* this handbook . . . . (emphasis added)"

\* \* \* \* \* \*

"*However,* you *must* realize the fact that there are over 13,000 inmates in the TDC, and that those of you in the southern units are geographically isolated from the attorney's main office in Huntsville. (emphasis in original)"

"If all of you expect to have personal interviews with the attorney, you will have to *wait—probably for a very long time.* . . . (emphasis in the original)"

Moreover, and more importantly, I am compelled to dissent from the portion of the opinion dealing with solitary confinement. I would hold that solitary confinement as actually carried out by the TDC, not as described in regulations, clearly constitutes a violation of the Eighth Amendment. I am quite reluctant to disagree with my brothers of the majority on an issue which, I think, necessarily, involves the application of a moral code to one of society's most difficult problems.[1] However, there is no indication that the majority and I differ as to our concept of what the moral code should be. The difference lies in our concept of the extent to which judges can "risk" permitting their "own personal moral code" in such an area as this to be "impose[d] . . . on a perhaps unready society." For myself, I do not hesitate to assert the proposition that the only way the law has progressed from the days of the rack, the screw and the wheel is the development of moral concepts, or, as stated by the Supreme Court in Trop v. Dulles, the application of "evolving standards of decency" 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1957).

This, therefore, poses a further difference between the members of the court. If, as is stated by the majority, they "are deeply troubled by the lightless cell, the limited bedding, [a blanket, according to the findings of the trial court] and the minimal food provided prisoners in solitary confinement in Texas", then I do not agree with them that we are limited by what has been done by other courts or by the "general practices of our society."

As to the limiting effect of the "extant law," which I shall undertake to analyze below, we must remember that in each of the cases referred to in the opinion in which cruel and unusual punishment was found to exist, *some* court had to take at least a short step beyond what had previously been decided. This, in fact, is the genius of the common law. I think it is the duty of the court whose members are "deeply troubled" by these conditions to seek a means of removing them that may offer more promise than merely saying that "prison reform is primarily a task for legislators and administrators."

I feel that it is permissible for us to take judicial notice, as the majority apparently did, of the current spate of criticisms of our penal systems. It would be utterly unrealistic to ignore the fact that penal reform comes more slowly than progress in other activities of our society which seem to have much higher priorities. To leave the prisoners to the tender mercies of the legislatures and thereafter to the administrators who are denied the means to accomplish the reforms, seems to me to hold out slight, if any, hope that these "deeply troubling" conditions will be outlawed.

For this court to tell the prisoner to look to the legislature and an administrator who has condoned, and still excuses them, would seem to me but an empty gesture, and calls to mind an answer right out of Aeschylus: "Hollow words, I deem are worst of ills". *Prometheus Bound.*

In sum, I think this is an area in which the court should move. Such action by

---

1. Note that the majority opinion commences with a reference to "tragic incidents in the Nations prisons and of the frequent assertions of the inadequacy of our penal systems."

us is not only justified, it is called for if the Anglo-Saxon system of justice is to remain living and vigorous. The Supreme Court, in Bartkus v. Illinois, 359 U.S. 121 at pg. 128, 79 S.Ct. 676, at pg. 680, 3 L.Ed.2d 684 speaking through Mr. Justice Frankfurter, stated:

"The Anglo-American system of law is based not on transcendental revelation but *upon the conscience of society* ascertained as best it may be by a tribunal disciplined for the task and environed by the best safeguards for disinterestedness and detachment." (emphasis supplied)

The duty of a court like ours to act in such a matter has, I think, been expressed with his usual great felicity by Judge Learned Hand:

"[The common law] must be content to lag behind the best inspiration of its time until it feels behind it the weight of such general acceptance as will give sanction to its pretension to unquestioned dictation. Yet with this piety must go a taste for courageous experiment, by which alone the law has been built as we have it, an indubitable structure, organic and living. It is in this aspect that the profession of the law is in danger of failing in times like our own when deep changes are taking place in the convictions of men. It is not as the priest of a completed revelation that the living successors of past law makers can most truly show their reverence or continue the traditions which they affect to regard. If they forget their pragmatic origin, they omit the most pregnant element of the faith they profess and of which they would henceforth become only the spurious and egregious descendants. Only as an articulate organ of the half-understood aspirations of living men, constantly recasting and adapting existing forms, bringing to the high light of expression the dumb impulses of the present, can they continue in the course of the ancestors whom they revere." "The Art and Craft of Judging—The Decisions of Judge Learned Hand", Hershel Shanks, page 17.

Now, what are these "deeply moving" conditions of solitary confinement?

A person sentenced to solitary is kept in a bare, pitch black cell on a bread and water diet. The cell has a barred iron gate backed up by a wooden door to keep out all light and prevent contact with those in the hall. He is fed only two slices of bread and water each day and one full meal every 72 hours.[2] This treatment can continue for up to fifteen days, at which point he is kept in the *same* cell,[3] but with the solid door open to let in the light and is fed regular meals for two days. This process may then be repeated again. As the record reveals, inmate Bobby Brown was kept in solitary for a period of about seven weeks. Another prisoner spent nine weeks in solitary within an eleven month period.

In addition to the bread and water diet, the cell is barren of furnishings except for a combination toilet-washbasin and a steel bunk. The bunk, however, has no mattresses, sheets or pillow. Though the prisoner is provided with a blanket, the inmate has no clothes, no shoes, only a cloth gown and, except when taken to the shower, he spends all of his time in the cell. While there he has no access to hot water; he is not allowed to

2. Although regulations provide for a full meal as served off the steam table upon the expiration of 72 hours (it may be breakfast, lunch or dinner) every inmate witness testified that in point of fact such meal *never* equaled the full meal—that there was no meat, no sweets and no drink, regardless when served. There was no specific rebuttal of this testimony, other than by persons who were not active observers of the service.

3. The regulation clearly states that at the end of 15 days the prisoner "*should be taken out* of solitary, placed in a cell or if dormitory residence, left in cell with door open. After 2 or 3 days, depending upon physical condition, he may be returned to solitary and the procedure continued." (emphasis added) It is unrefuted that all those in solitary for more than 15 days never left the same cell.

have a comb or eyeglasses and, upon release from solitary, the inmate's head is shaved bald.

The regulations of the TDC require that an inmate be weighed and that the weight be recorded upon admittance and upon release. A study of the individual records indicates that frequently no weights were entered on release. Moreover, while one might assume that solitary is usually reserved for the most recalcitrant of prisoners, it is apparent from this record that such confinement may be meted out at any time for any offense, regardless of its gravity, with no objective standards, and often summarily without a hearing.[4]

Except as noted these facts and conditions stand without dispute.

And indeed, there is one fact which I feel must be emphasized. While no evidence was introduced to show the calorie content of two slices of bread, it is of such common knowledge that it need not be documented, it seems to me, that a slice of bread normally contains from 70 to 90 calories, and the very maximum for enriched bread would be 125 calories. This would mean a maximum of 250 calories a day. *This is simply a starvation diet.* Dr. Beto's testimony that the prisoners in other kinds of segregation in T.D.C. were given a 2100 calorie diet because they were not engaged in active work rules out any justification for furnishing a diet of 250 calories a day to prisoners in solitary except as a matter of physical punishment.[4A]

It must be noted at the outset that the T.D.C. does not challenge the jurisdiction of the Federal Court to pass judgment on these conditions if questioned as cruel and unusual. It does not argue that such prison matters should not be interfered with because the state now has a program gradually aimed at eliminating the excesses described above and is at least moving toward what various commentators have described as the "rehabilitative ideal." It simply says these conditions should be acceptable as a part of the prison's disciplinary scheme. It argues that, despite the fact, as the trial court found, "that certain aspects of the Texas ap-

---

4. Records of inmates show that they have been sent to solitary for having called a guard a Klansman, for "impudence", for "insolence", or "insubordination", for "laziness", for "unsatisfactory work," for having a law book in a cell; for letting another inmate *look* at a law book; for "possession of an unauthorized writ, carrying it to Sunday School"; and for failing to "shell peanuts". (This is itself a punishment—inmates are required to shell enough peanuts to make a gallon of *shelled* peanuts, a task which, according to the record may take several hours.) We have noted that on one occasion Cruz was sentenced to shell three gallons—all after the day's work, of course.

· Moreover, there is no categorical denial of the testimony as to specific repeated instances of *summary* punishment by any witness who was in a position to know the precise facts. The trial court made no finding of fact as to this.

Further, it is by no means clear that the regulations, even if followed, require a hearing prior to solitary confinement. They simply state:

"When a correctional employee witnesses or has knowledge of an act by an inmate which is in violation of the rules and regulations or good order, and if the

infraction cannot be properly handled by the observing employee, he will take the action necessary to bring the inmate before the supervising officer on duty. *If the supervising officer is not able to properly dispose of the infraction, the report of the infraction will be processed* as follows for action by the *Unit Disciplinary Committee.*" (Emphasis added).

The Unit Disciplinary Committee holds hearings only on those cases which have been referred to it. Thus, it is entirely possible that the regulations themselves allow what many prisoners have testified to—namely, commitment to solitary by a supervisory officer *with no opportunity for a hearing.*

4A. It is evident that during the testimony given on this point, there was a good deal of confusion as to whether a 2100 or a 2500 calorie diet was recommended as a bare minimum for prisoners confined in segregation. The fact that those in solitary, by receiving only two pieces of bread, in effect received roughly one/tenth of the calories of those in segregation was not specifically stated. This point can, I think, easily be inferred from this record.

proach are below the standards of some other states . . . especially with respect to food, lighting and recreation," the conditions described above are not *as bad as those* in which courts have, in the past, found Eighth Amendment violations, and furthermore, such an ultimate sanction is absolutely necessary to preserve prison discipline.

Along with the trial judge and the majority, I too have no doubt that this court has jurisdiction to pass on this issue. As the Supreme Court stated in Johnson v. Avery, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1968):

> "Tennessee urges, however, that the contested regulation in this case is justified as part of the State's disciplinary administration of the prisons. There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene. It is clear, however, that in instances where state regulations applicable to inmates of prison facilities conflict with such rights, the regulations may be invalidated."

Since Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the prohibition against cruel and unusual punishment has been applicable to the states through the due process clause of the fourteenth amendment. Although we realize that federal courts have traditionally been reluctant to intervene in matters of prison discipline, they must, nonetheless, recognize their duty to adjudicate claims of cruel and unusual punishment when properly raised. Indeed, in the words of Mr. Justice Blackmun, writing as a circuit judge for the Eighth Circuit in Jackson v. Bishop, 404 F.2d 571, at 577, a class action brought under § 1983:

> " . . . the courts, including this one, have not hesitated to entertain petitions asserting violations of fundamental rights and, where indicated to grant relief. In Glenn v. Ciccone, . . . this court clearly indicated that 'a fac-

tual showing of cruel and unusual punishment in violation of the Eighth Amendment' would support interference by a federal court. 370 F.2d [361] at 363. We have made a like statement in many other cases. Carey v. Settle, 351 F.2d 483, 485 (8th Cir. 1965); Haynes v. Harris, 344 F.2d 463, 466 (8th Cir. 1965); Harris v. Settle, 322 F.2d 908, 910 (8 Cir. 1963), cert. denied, 377 U.S. 910, 84 S.Ct. 1171, 12 L.Ed.2d 179. Although the Eighth Circuit cases just cited concern a federal institution, *the principle, of course, has equal application to a state penitentiary.* Wright v. McMann; 387 F.2d [519] at 522 (2nd Cir. 1967); Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966), cert. denied, 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449. (emphasis added)

The court then went on to uphold the trial court's injunction against the use of a strap for punishment in the Arkansas state prison system, relied on, of course, by the state as absolutely necessary to maintain discipline.

I would conclude that the *combination of circumstances* in this case not only raises serious Eighth Amendment questions, but is sharply out of line with the "evolving standards of decency," the standard set forth by the. Supreme Court in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1957). Further, I find such treatment to be a startling example of overkill, which, on the basis of this record, has a totally negative impact on any hope for rehabilitation. In short, I would find the solitary confinement as implemented by TDC to be a violation of the cruel and unusual punishment clause of the Eighth Amendment.

A finding of cruel and unusual punishment does not depend upon the use of physical violence like the strap, the rack or the wheel of old. In Trop v. Dulles, supra, the Supreme Court held that deprivation of citizenship as a punishment for wartime desertion was cruel and unusual. In so doing the Court stated that denationalization was "a form of punishment more primitive than torture, for

it destroys for the individual the political existence that was centuries in the development." The "dignity of man" was said to be the overriding value to be preserved by the prohibition, and the court clearly recognized that the standard for determining whether a method of punishment was cruel and unusual must be based upon "evolving standards of decency that mark the progress of a maturing society."

The majority, however, though recognizing the recent tragic incidents in this Nation's prisons, and "the lightless cell, the limited bedding, and the minimal food" provided the prisoners in this case, nevertheless states:

"As judges, we must look to the extant law and the general practices of our society. Otherwise, we run the risk of imposing our own personal moral code on a *perhaps unready society.*" (emphasis added)

Surely, our society has evolved to the point where a diet of two pieces of bread and a quantity of water, total darkness, scanty clothing, little or no exercise and the shaving of one's head (a final act of humiliation) is beyond such "standards of decency" that can be tolerated, whatever the alleged benefit to prison discipline such treatment may yield. Not only do these conditions demean the human dignity of the inmate involved, but as they reflect the extent to which society will go in punishing its prisoners, they affect us all. For it is implicit in the Court's opinion in *Trop* that imbedded in this society are certain standards of human decency that put a limit on the *kind* of punishment we will inflict on *anyone,* regardless of his offense. Though we may be dealing here with some of the most incorrigible members of our society (although not solely), how we treat these particular individuals determines, to a large extent, the moral fibre of our society as a whole and if we trespass beyond the bounds of decency,

such excesses become an affront to the sensibility of each of us.

The majority also implies that were we to find an Eighth Amendment violation in this case, we would be taking an unprecedented step.[5] A look to the distant past as well as to a recent line of cases requires, I feel, a different conclusion.

Indeed, the idea that certain kinds of solitary confinement constitute cruel and unusual punishment is not new. As long ago as 1890 the United States Supreme Court clearly saw and clearly articulated the vice of solitary confinement even for a relatively short period of time under conditions less onerous than those here under attack. In *Medley*, Petitioner, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835, an original application for habeas corpus in the Supreme Court, the Court considered whether the sentence of solitary confinement as a prelude to execution of the death sentence (to be accomplished within four weeks) violated the prohibition of Section 10 article 1 of the Constitution forbidding the passage of any *ex post facto* law. At the time of commission of the crime of first degree murder for which Medley was convicted and sentenced, there was no provision for solitary confinement in the state penitentiary while awaiting execution; the law formerly in force provided that such convicted murderer remain in the county jail until executed. In considering whether this change was "such invasion(s) of his rights as to properly be called (an) *ex post facto* law(s)" the court said:

"This matter of solitary confinement is not, as seems to be supposed by counsel, and as is suggested in an able opinion on this statute, furnished us by the brief of the counsel for the State, by Judge Hayt, (in the case of Henry Tyson,) *a mere unimportant regulation as to the safe-keeping of the prisoner,* and is not relieved of its ob-

---

5. Even if this were true, it would be merely the slightest step in a direction which I believe the majority agrees would be the right direction. The fact that it would be unprecedented for want of an identical prior decision is not, as I have already stated, an answer to the petitions here.

jectionable features by the qualifying language, that no person shall be allowed access to said convict except his attendants, counsel, physician, a spiritual adviser of his own selection, and members of his family, and then only in accordance with prison regulations.

Solitary confinement as a punishment for crime has a very interesting history of its own, in almost all countries where imprisonment is one of the means of punishment. In a very exhaustive article on this subject in the American Cyclopaedia, Volume XIII, under the word "Prison" this history is given.

In that article it is said that the first plan adopted when public attention was called to the evils of congregating persons in masses without employment, was the solitary prison connected with the Hospital San Michele at Rome, in 1703, but little known prior to the experiment in Walnut Street Penitentiary in Philadelphia in 1787. The peculiarities of this system were the complete isolation of the prisoner from all human society, and his confinement in a cell of considerable size, so arranged that he had no direct intercourse with or sight of any human being, and no employment or instruction. Other prisons on the same plan, which were less liberal in the size of their cells and the perfection of their appliances, were erected in Massachusetts, New Jersey, Maryland and some of the other States. But experience demonstrated that there were serious objections to it. *A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.* It became evident that some changes must be made in the system, and the separate system was orig-

inated by the Philadelphia Society for Ameliorating the Miseries of Public Prisons, founded in 1787.

\* \* \* \* \* \*

The brief of counsel for the prisoner furnishes us with the statutory history of solitary confinement in the English law. The act 25 George II, c. 37, entitled 'An act for the better preventing the horrid crime of murder,' is preceded by the following preamble: 'Whereas, the horrid crime of murder has of late been more frequently perpetrated than formerly; and whereas it is thereby become necessary that some further terror and peculiar mark of infamy be added to the punishment of death now by law upon such as shall be guilty of the said offence'—then follow certain enactments, the sixth section of which reads as follows: *'Be it further enacted,* That from and after such conviction and judgment given thereupon, the jailor or keeper to whom such criminal shall be delivered for safe custody shall confine such prisoner to some cell separate and apart from the other prisoners, and that no person or persons whatsoever, except the jailor or keeper, or his servants, shall have access to any such prisoner, without license being first obtained.'

This statute is very pertinent to the case before us, as showing, first, what was understood by solitary confinement at that day, and second, that *it was considered as an additional punishment of such a severe kind that it is spoken of in the preamble as 'a further terror and peculiar mark of infamy'* to be added to the punishment of death. In Great Britain, as in other countries, public sentiment revolted against this severity, and by the statute of 6 and 7 William IV, c. 30, *the additional punishment of solitary confinement was repealed."* (emphasis added)

The court concluded that this additional "infamous" punishment could not be meted out to the condemned murderer and since this was part of his sentence

held to be void, and the law had repealed the old statute fixing punishment, the court was required to discharge the petitioner from his death sentence.

We recognize that the solitary confinement in Medley's case was while he was on death row, and this made more poignant, if not more punitive, the solitary confinement part of the sentence. However, we also note that there were not present several of the harshest features of solitary as it was suffered by the plaintiffs here. There was no bread and water diet; there was no total darkness, and for all that appears there was no complete lack of visitation. Moreover, in its discussion of the effect on the prisoners—"A considerable number of the prisoners fell, *even after a short* confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better *were not generally* reformed, and, in most cases did *not recover* sufficient mental activity *to be of any subsequent service* to *the community"* (emphasis added)—the court spoke directly to the use of solitary confinement unrelated to the circumstances of an impending death sentence.

The majority, however, notes that the recent cases which have held that certain conditions of solitary confinement have violated the cruel and unusual punishment clause have all involved unconscionably unsanitary conditions in the cells. Since the proof here is that the cells involved in this case are clean and the prisoners are provided with the basic implements of personal hygiene, no violation, they argue, has occurred.

I reject such a narrow reading of these cases. Indeed, as one commentator has pointed out:

"... the courts have not rested their decisions simply on that ground (sanitation). Rather, they have considered the totality of the dehumaniz-

ing circumstances and have condemned that totality as unconstitutional. Turner, 23 Stan.L.Rev. 473 at —— (1971)."

An examination of some of these cases reveals that unsanitary conditions were but one of many factors that led to the court's decision. The fact they are lacking in the case at bar does not make this case unprecedented. It simply means that I rely on a *different combination* of dehumanizing factors that compel me to conclude that the Eighth Amendment has been violated.

In Wright v. McMann, 387 F.2d 519 (2nd Cir. 1967), the solitary cell was encrusted with excrement. There was no soap, towels or toilet paper. Further, petitioner was placed in the cell entirely naked and, since there was only a toilet and a sink in the cell, he was forced to sleep on the concrete floor with the windows open, even during subfreezing weather. Petitioner also claimed that he received no advance notice from the prison authorities of the charges against him, was not permitted to call witnesses, confront his accusers or defend himself in any manner.

As shocking as these facts are, it must be noted that Wright was not, as here, subject to complete sensory deprivation. His cell was lighted. Further, he was not placed on a starvation diet, but continued to receive the regular institution diet. Finally, it should be noted that as in *Wright,* there is considerable testimony to suggest that this punishment is often given out in a manner devoid of any procedural protections.[6]

In Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn.1969), the dry cell was unlighted, save for dim artificial light which was able to seep from the outside corridor through two small slit screens in the cell door, and the interior was devoid of furnishings except for a hole in the rear of the cell constructed to receive bodily wastes. There was no mechanism in the cell to flush waste from this hole. This was controlled by a guard on

6. See note 4, supra.

the outside. As a result of infrequent flushing, objectionable odors often permeated the cell. Further, the cell was not cleaned while the prisoners occupied it and they were given no hygienic materials. Finally, they were forced to remain entirely nude. The trial court, thus concluded that these conditions made "it evident that fundamental concepts of decency did not prevail."

By comparison, we note that in the case at bar the cell is pitch black. Further, the diet in *Hancock* was significantly better. Prisoners received *three* meals each day—bread at breakfast and supper, but a *full meal each noon*. Finally, the prisoners in this case, though clad in a prison gown and in possession of a blanket, also were forced to sleep on a steel bunk without a mattress.

In Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969), the solitary cells were in a heated, well ventilated building. There were no windows, but there were electric light bulbs. Each cell had a drinking fountain and a toilet, though it could be flushed only from the outside. The occupants were regularly fed a wholesome and sufficient food called "grue" which the court described as consisting "of meat, potatoes, vegetables, eggs, oleo, syrup and seasoning baked all together in a pan and served in four inch squares." Id. at 832. They were also given plain cotton mattresses. The cells, however, were dirty and the mattresses were unsanitary. There was evidence that infectious diseases were spread by the indiscriminate use of these mattresses. Further, these cells were often overcrowded with as many as four per cell. This greatly added to the unsanitary conditions then prevailing.

However, by comparison we again note that these cells were lighted. Their occupants were regularly fed a wholesome meal. Further, the court in that case specifically found that the punishment was not meted out "unjustly, arbitrarily, or discriminatorily." There was also at least an attempt to provide some kind of bedding.

Finally, we look at another combination of factors commented upon by the Supreme Court in a per curiam opinion. Though the issue of cruel and unusual punishment was not specifically raised, the Court stated:

". . . the parties agree that the punishment cell had no external window, that it contained no bed or other furnishings or facilities except a hole flush with the floor which served as a commode, and that during the first 14 days he lived in this cell. Brooks' only contact with the outside was an unspecified number of interviews with the prison's investigating officer. It is also agreed that while so confined Brooks was fed a "restricted diet" consisting, according to the testimony of the investigating officer, of 'peas and carrots in a soup form' three times daily. Brooks' more detailed description of this concoction—'they fed us four ounces of soup three times a day and eight ounces of water'—was not controverted, nor was his testimony that he was stripped naked before being thrown into the cell." Brooks v. Florida, 389 U.S. 413, 88 S.Ct. 541, 19 L.Ed.2d 643 (1967).

The court went on to hold that a confession under these circumstances was not voluntary, stating:

"These stark facts belie any contention that the confession extracted from him within minutes after he was brought from the cell was not tainted by the *14 days he spent in such an oppressive hole*. Id. at 415, 88 S.Ct. at 542. (emphasis added)

Surely, the combination of factors we deal with in the case at bar is not so out of line with the fact situations outlined above as to be offensive only due to "some fastidious squeamishness or private sentimentalism" (Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) on my part. In no case cited above was there such complete sensory deprivation coupled with a starvation diet. Indeed, if there is a common thread running throughout all these

cases, including the one at bar, it is not the presence or absence of unsanitary conditions, but the deprivation of what should be the minimal comforts and institutional privileges that make prison life tolerable. For those in solitary confinement, at the very least, there ought to be regular meals, light and bedding.

Finally, the majority states that the conditions we face in this case have withstood the scrutiny of other courts. Krist v. Smith, 309 F.Supp. 497 (S.D.Ga.1970), aff'd, 439 F.2d 146 (5th Cir. 1971) and Ford v. Board of Managers, 407 F.2d 937 (3rd Cir. 1969) are cited. Each, I feel, is easily distinguishable.

The conditions of solitary confinement in *Krist* consisted of a cell in which there was a bed, a table, basin, shelf and a commode. The complaint, concerning the food, alleged that the diet was unbalanced in that there were no vegetables, no fruit and far too much turnip greens. The right kind of shampoo was not available. Petitioner could not get books from the prison library without considerable trouble. He complained that there was no television or movies and that the medical care he received was shoddy. The trial court held that such allegations were matters of internal prison administration. The Fifth Circuit agreed, adding that "federal courts will not interfere except where paramount federal constitutional or statutory rights intervene." Surely, there is little to compare in *Krist* with the conditions in our case. Such circumstances as found here clearly involve the protection afforded by the Eighth Amendment.

In *Ford,* the complaint alleged that none of the solitary confinement cells had wash bowls or running water, that the inmates' shower was not given every fifth day as required, that his cell was unsanitary, and that his diet consisted of four slices of bread and a pint of water *three* times daily with a full meal every third day.

While these are not the best of circumstances, the diet these inmates received was *six times* as much as the prisoners in this case. Further, the cell was lighted and "an old mattress with a clean cover on a cement shelf [was] provided for bedding." Further, it should be noted that this case never went to trial and thus, expert testimony regarding the effect of such treatment was not in the record.

Finally, Sostre v. McGinnis, 2 Cir., 442 F.2d 193 (1971) is cited as an example of an appropriate judicial response to such Eighth Amendment questions. Indeed, the court then invoked the traditional "hands off" doctrine in dealing with the problems it faced, but in that case this was not at all inappropriate. The prisoners' diet was, except for desserts, the same as that of the general population; rudimentary implements of personal hygiene were available; there was an opportunity for daily exercise in the open air; though the period of confinement was indefinite, an inmate could release himself from solitary by agreeing to participate in group therapy; reading matter from the prison library was available as well as unlimited access to legal materials. Further, the cell was lighted and there was the constant possibility of direct communication with other prisoners. Finally, the court noted the absence of any testimony that solitary threatened the mental or physical health of the prisoner. Surely, the Court in the Second Circuit was wise in not intervening in such a situation. Needless to say, with the exception of personal hygiene, every factor listed above is absent in this case.

Having concluded that the conditions of this case do not constitute cruel and unusual punishment, the majority undertakes to bolster its position by showing the context within which this punishment occurs. They find solace in TDC's regulations regarding disciplinary proceedings concluding that "after studying this record in its entirety, we have found ample evidence to establish that TDC complies with virtually all of these guidelines in its administration of solitary confinement."

I, too, have examined this record. I not only find it to be replete with evidence of violations of TDC's own regulations, but, to a large extent, I find that the kinds of guidelines and practices pointed out by the majority, though perhaps showing good faith on the part of TDC, are nonetheless irrelevant to the issues presented by this case.

One thing that stands out starkly—like the incandescent lamp that is lacking in these cells—is the fact that there is no word or suggestion in the regulations that the solitary cells are to be absolutely without lights. It speaks, somewhat euphoniously, about prisoners in punitive solitary confinement being placed in "special facilities." It is obvious that this makes much better reading than if the regulations expressly prescribed a "pitch black cell." Thus, it is plain that punishment as administered is much more harsh in one important detail than called for by the published regulations.

Also, as stated above,[7] the full meal that should be granted is seldom a full meal; inmates are sent to solitary for a variety of offenses many of which are insignificant; their punishment is often handed out summarily, without a hearing; though the regulations say that the inmate should be weighed before, during and after solitary, such weights were rarely recorded. Indeed, in addition to the conditions of solitary, virtually every prisoner who testified complained of the blatant disregard of the regulations by TDC. This testimony was not refuted by anyone who was in a position to know the facts (by the guards, for example) and the trial court made no findings of fact.

Further, the majority finds comfort in the fact that there are statistics in this record which show that the ratio of the average number of male inmates confined to solitary on a given day to the average total inmate population over a period of one year runs around 2.1%. This, it is said, indicates that solitary is used sparingly. Moreover, the majority also points to a report which stated that *on the particular day* that it was compiled, few of the inmates confined were subjected to a full fifteen day detention.

I find such figures to be totally beside the issue in this case. Whether certain conditions constitute cruel and unusual punishment does not depend upon whether 1% or 99% of the prison population was forced to endure them. Suppose TDC used the strap, as did Arkansas until forbidden as cruel and unusual punishment, would its infrequent use make it any less of a violation of the Eighth Amendment? In a case of this sort, a decision must be based on the conditions themselves, not the number of inmates that must endure them.

Similarly, the fact that many prisoners do not spend a full fifteen days in solitary is also irrelevant. Indeed, the majority ignores the undisputed fact that inmate Bobby Brown was kept in solitary for a period of about seven weeks in 1968. Even if it were relevant to look to *the particular day* the majority takes its figures from, two inmates had been in for a full fifteen day period and 35 were in for a full week or more.[8] In short, what is at issue here is the constitutionality of a regulation that submits prisoners to a particular form of punishment which *can* and *often is* imposed for 15 days or more. One must focus on the conditions themselves, not the frequency with which inmates must endure them for the full 15 day period, or more.

Nevertheless, even if it is conceded that these figures are relevant, my examination of the record conveys a com-

---

7. See footnotes 2, 3 and 4.

8. The figure of 132 prisoners which was broken down, of course, shows only how long those 132 had been in solitary *up to that day*. This proves nothing. So far as the record shows all of the rest of the 132 may have remained in solitary for a week or ten days thereafter.

pletely different impression. Contained in this record is a computer print out entitled: "History of Solitary Confinements Since November, 1968". It covers the period of November 1968 to September 1969. It reveals that during this time span 2816 inmates were subjected to solitary confinement. This is roughly 22.5% of the entire prison population. Put another way, during a nine month period nearly one of every four prisoners at TDC can expect to be subjected to solitary confinement. Further, if one adds to this figure the number of times some of these same inmates repeated during this time span, the total grows to 4,164. This is not what I would characterize as a sparing use of this form of punishment. And indeed, over the course of a full year the figure of 2816 could be expected to reach approximately 3500 without correcting for repeats.

The majority also points to the records of *some* of the inmates involved. They conclude that:

"It seems fair to say that the prison authorities *might have concluded* that these were prisoners upon whom all lesser forms of discipline had failed." (emphasis added)

Again I ask, would this fact justify the use of the strap or the rack or the wheel? A consideration such as this adds nothing to a decision concerning the constitutionality of the conditions TDC can subject *any* inmate to, be he a first offender or the most recalcitrant prisoner in the entire system. And indeed, the majority's reference to the fact that appellant Cruz is no stranger to this court seems to me to be wholly irrelevant. We all know that we are dealing with persons who have been tried and convicted and are serving time.

I would, in short, hold that the conditions of solitary confinement as implemented by TDC are totally out of line

with the standard set forth in *Trop*. In addition, I would also hold that the punishment as applied is overbroad, and clearly goes much further than is necessary in carrying out the legitimate state interest in maintaining prison discipline. Even if I were to conclude that the treatment in this case did not constitute cruel and unusual punishment, its application because of violating for example, the ban on inmate assistance seems to me to be a striking example of overkill.[9] As the court in Jordan v. Fitzharris, 257 F. Supp. at 679, stated:

"A punishment may be [considered] cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used." Weems v. United States, 217 U.S. at [349] 370, 30 S.Ct. 544 [54 L.Ed. 793]

There is no doubt that there is a need to isolate certain prisoners. Indeed, I agree with appellees that a crucial question that must be answered is:

What can be done with the inmate who refuses to conform with prison rules—who refuses to change his attitude in response to either counseling or to a gradual withdrawal of prison incentive programs—and who is a constant source of trouble to authorities to the extent of disrupting their efforts at rehabilitation of other inmates?

Removing such a prisoner from the general population may, of course, be necessary. However, nothing in the record proves that such extreme treatment as here present *in connection with* segregation has either a deterrent effect upon him or the inmates or is at all necessary in maintaining order in the prison.

---

9. There may be some reason other than simple whimsicality or vindictiveness that would cause the "committee" to send one of the prisoners to solitary for 10 days for committing the felony of sodomy, while sending him to solitary for *two successive* 15 day sentences for having a law book or paper in his cell, but none occurs to us. Such a grotesquerie is shown by this record.

The majority, however, feels that the form of punishment in this case has a deterrent effect. They state:

Both the testimony of the prisoners in this case and the statistics revealing the low rate of returns to solitary support the conclusion that solitary is an effective deterrent of nonconforming prison conduct.

An examination of these statistics and a sample of testimony that is illustrative of this record refutes, I feel, this conclusion.

Of the 2816 inmates who were sentenced to solitary in a nine month period, 833 or 29.51% had the treatment repeated at least once within this relatively *short* span of time. 555 were confined twice; 170 were confined three times; 51 were confined four times; 27 were confined five times; 16 were confined 6 times; 6 were confined 7 times; 6 were confined 8 times; 1 was confined 9 times and 1 was confined *10 times*. Indeed, since this covers only a nine-month period, it can readily be assumed that the percentage of repeaters over a one or two year period is substantially higher. I would not characterize such figures as illustrative of any significant deterrent effect such treatment allegedly has.

The majority refers to the testimony of the prisoners. Also, the trial court, by frequent colloquy with the prisoner witnesses, seemed willing to treat them somewhat as experts. On the matter of deterrent effect, I find no testimony more lucid or logical than that given in response to questions by the trial court who seems to suggest that these substandard conditions should be used even to correct prisoners who are "not very smart and . . . might be a little emotionally disturbed."

This colloquy was with plaintiff witness Cruz:

"The Court: What kind of punishment is the most effective in prisons whenever somebody repeatedly violates the regulations of the prison?

The Witness: (No response.)

The Court: How about whipping, Would that deter people from violating the regulations in prison if you tied them to a stake in the prison yard and whipped them, not break any bones, not whip them unconscious but whip them so that they know they've had a whipping,

The Witness: I wouldn't think so. They have been doing that in southern penitentiaries in Arkansas and Mississippi, I believe.

When you use physical force on a man, the only thing you do is breed hostility. If you are imposing punishment on him, you don't give him a prior hearing prior to the time to determine his guilt or innocence, you breach his respect for authority and when he goes back in society, he takes that hostility and hatred with him and that's why a lot of people go back in society and commit more crimes and it creates a cycle and you just keep turning and turning.

The Court: What sort of punishment would be appropriate to deter an inmate from breaking regulations after he has —assume he has broken a regulation which is a valid regulation and that he has been brought up before the disciplinary committee. They told him, well, you broke the regulation. And he said, yes, I did.

Now, what kind of disciplinary punishment, what kind of punishment would be appropriate so that it would encourage him not to violate the regulations again?

The Witness: I think that the most effective thing that could be done would be to take the prisoner and explain the reason for the regulation and the reason why he should not violate it where he could understand it and know that the regulation is geared to a legitimate purpose.

The Court: Suppose, though, you have got a prisoner *who is not very smart and he might be a little emotionally disturbed.*

*Now, don't you think that he should be punished* so he will learn that he can't keep doing what he is doing? (emphasis added)

The Witness: You take a prisoner who is not too smart, who is emotionally disturbed, I believe those people should be helped through a psychiatrist and counseling so that they would be able to understand. If they are not responsible for their actions, I don't believe that they should be punished since they will not understand after they have been punished that they should not commit the same thing again. They won't understand.

The Court: Can you think of any instance when a prison authority should try to help the prisoner—is there any situation where punishment does help a prisoner when he violates a regulation?

The Witness: I believe that if a prisoner keeps violating those regulations, isolate them, put them some place where they can meditate and solve his problems, where he can get an insight to whatever his problem is and understand it and how it functions, then I believe that he will eventually become aware of what's really going on so that when you do release him, if he tells you he knows he has done wrong, and I believe he would be entitled to another chance.

The Court: Suppose you give him another chance and he violates a valid regulation again? What would you do with him then?

The Witness: I guess just repeat the process.

The Court: Suppose it doesn't help? Here is a Warden with hundreds and hundreds of people. The state courts send them from all over Texas. He has got the job of rehabilitating and confining them and keeping them there at the sentence set by the courts. He doesn't set the sentence.

Don't you think if he didn't have some way of punishing these people, that he couldn't run the prison?

The Witness: I realize that some restraints are necessary for the efficient function of a penal institution.

The Court: I am not talking about restraints. You are restrained when they send you there. If you are convicted of armed robbery, they don't want you to kill innocent citizens who pay taxes. They don't want young kids to shoot them with guns for not giving them money. They have to restrain you to keep you from killing somebody.

After you get to prison, how is the Warden going to control the prison population if he doesn't have the right to punish people when they violate the regulations?

The Witness: I believe that disciplinary procedures are essential to the function of a prison.

The Court: What sort of disciplinary action other than, you say, isolate them until they learn?

The Witness: Yes, sir. Subject them to processes of education where they can become aware of the situation. I do not believe that solitary confinement is—

The Court: Don't you know that if you could prove to a man through education that he ought to behave himself, that that proof doesn't help him? We have many people in Huntsville who are very educated. Is that right?

The Witness: Yes, sir.

The Court: What about the person who keeps violating regulations in prison and the prison authorities must have discipline. Otherwise, they can't keep that number of men together. How can he enforce discipline?

The Witness: I don't have the expertise on that, your honor. I can just say from my own experiences, the way that I feel since I have been down there and the effect this punishment has had on me.

The Court: What has that done to you?

The Witness: For one thing, it has made me more resolute in trying to enjoin some of these unreasonable regulations that I feel are wrong.

The Court: The law did not give you the power to make the regulations, see? You just are an uneducated young man with an eighth grade education. The law puts power to regulate the prison in expert's hands like Dr. Beto.

Why don't you recognize that that's what the people of Texas want to do and obey its regulations, even though you disagree with them?

The Witness: I recognize the fact that he does have a broad discretion in promulgating these rules and regulations, but I also recognize the fact that he could not enforce a rule and regulation that is in contradiction of federal law. He is under the obligation of law, just like I am, to obey the regulations. He also has to obey the law and he also has to protect my rights in support of regulations that punishes me for exercising constitutional rights. That's provided for by federal statute. I believe he is wrong if that regulation is wrong. I feel I have a moral duty to resist it and that's what I have been doing."

In addition to the overbreadth aspects of the treatment, it may be determined to be cruel and unusual on yet another ground. This record supports the proposition that TDC's treatment has a totally negative impact on any hope for rehabilitation. Indeed, the psychological effects of such confinement have long been considered most destructive.[10] The record, for example, reveals that certain objects such as comb or eyeglasses are kept from one in solitary because he may be considering suicide. (See quotation from Medley, supra.) Surely, putting any man in a situation in which he contemplates suicide as a way out cannot be justified by any state interest in maintaining discipline. One does not have to be a trained psychologist to conclude that such treatment, intended to "break the spirit" of an unruly inmate will, if successful destroy all except the very strongest personality.

The majority, however, notes that experts disagree on the use of solitary and it is not the place of this court to resolve such a matter. Suffice it to say, the debate that is going on does not deal with solitary confinement accompanied by a starvation diet, no light, scanty clothing, the shaving of a man's head, etc. Totally isolating a man in a humane environment may or may not be helpful. We are *not* deciding that question. The question before this court concerns a particular kind of solitary confinement. We would be resolving no psychological debates in holding that this *form* of solitary violates the Eighth Amendment.

In addition, I cannot help but note that James V. Bennet, former Director of the Federal Bureau of Prisons and a person cited favorably by both sides, has recently testified:

"(t)hat the use of the bread and water diet 'is an archaic and discredited' system which has *'no effect' except that it complicates the man's health problem.'*" Hirschkop and Millemann, The Unconstitutionality of Prison Life, 55 Va.L.Rev. 795, 838 (1969).

I feel that this record supports this observation. Clearly, this ought never be the inevitable results of prison discipline even if it is aimed at maintaining order.[11]

10. See Medley, Petitioner, supra.

11. Though federal guidelines do not necessarily have a bearing in determining whether state prison authorities have exceeded the bounds of the Eighth Amendment, it is interesting to note that federal prisoners put in solitary confinement continue to be fed the same as the general population, have adequate lighting and get at least some exercise. Further, they are provided with a mattress to sleep on as well as reading material, and some correspondence and visiting privileges.

The majority in footnote 2 of its opinion states that as they understand the testimony of this case, federal prisoners in solitary received a bland loaf. Our reading of the federal prison regulations does not support this statement.

This relevant regulation states:

"4. *Food.* As prescribed in existing Bureau regulations, segregated inmates shall be fed three times a day on the standard ration and menu of the day for the institution. Disposable utensils may be used when necessary."

Prior portions of the regulations made plain the fact that "segregated inmates" as used here refers to those in *punitive* segregations, the harshest kind in the federal system.

Finally, the majority states that the judicial scope of our review is very limited under the cruel and unusual punishment clause. However, it must be kept in mind that the law of this Circuit has long been that once a prisoner is incarcerated

"Any further restraints or deprivations in excess of that inherent in the sentence and in the normal structure of prison life should be subject to judicial scrutiny." Jackson v. Godwin, 5 Cir., 400 F.2d 529 at 535.

Surely, the case before us and any like it is well within our scope of inquiry. Moreover, with a record replete with violations of TDC's own regulations, I cannot agree with the majority's willingness to give prison administrators the benefit of the doubt. As in other areas of the law, arbitrary thoughtlessness and administrative incompetence is every bit as offensive as the perversity of a willful scheme. See generally, Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 929 (2d Cir. 1968).

In conclusion, I note one more excerpt from this record.

"The Court: Would you fear if they tied you to a stockade and beat you with a whip?

The Witness: That wouldn't make me no fear. I am sure it would abuse me.

The Court: Would it keep you from breaking the regulations?

The Witness: As severe punishment will not stop it. Even these severe sentences don't stop us. It even makes people commit the same crime over and over."

This answer, I feel, eloquently as well as logically sums up the entire gambit of what is in issue in this case: complaints that punishment is meted out without a fair hearing; that the punishment is not in proportion to the offense; that it is punishment that is cruel and unusual under any circumstances; and, finally, that it is not a deterrent and does nothing for rehabilitation.

This statement by a semi-literate prisoner witness is more eloquently and effectively elaborated in a recent volume written by two highly qualified students of penology, Norval Morris, Professor of Law and Criminology and Director of the Center for Studies in Criminal Justice University of Sydney. They hold to the thesis that experience proves it to be pos- University of Chicago, and Gordon Hawkins, Senior Lecturer in Criminology sible to remove cruelties and infliction of physical or psychological suffering such as causes us here to be deeply troubled without harm to the end sought in deterring crime.

"(p)erhaps a more precise analysis of the relationship between mind and heart in penal reform is that our uniform experience, critically analyzed, seems to be that we can indulge our sense of decency, of reducing suffering even of criminals, without any adverse effect on the incidence of criminality. The history of penal reform thus becomes the history of the diminution of gratuitous suffering . . .

The diminution of gratuitous human suffering, gratuitous in the sense that no social good whatsoever flows from it, that it in no wise diminishes the incidence or seriousness of crime and delinquency, remains an important purpose of penal reform. One does not have to travel far anywhere in America to find thousands of convicted persons, adult and juvenile, subjected to needless suffering and for grossly protracted periods. And not only is such suffering useless; it is harmful to us. It tends to increase the social alienation of those we punish beyond our social needs, and it is highly probable that we pay the penalty of increased recidivism and increased severity of the crimes committed by those who do return from such punishment to crime." *The Honest Politician's Guide to Crime Control,* Morris and Hawkins, pp. 246, 247.

I again express my reluctance to differ with my brothers on a matter involv-

ing moral standards, be they those of our society or of us as judges. I am especially conscious of the inordinate length of this dissenting opinion. However, this is an area of the law which will present close and perplexing questions for future decisions. I feel, therefore, that this fully tried clear-cut issue deserves the most careful consideration the court can give it.

I would reverse the judgment of the trial court and remand for the entry of an order requiring regular meals, light and bedding.