Joseph **TAYLOR** et al.

v.

**W. L. STERRETT** et al.

Julius Dwaine **PERRY**, Sr., et al.

v.

James E. (Bill) **DECKER** et al.

**Civ. A. Nos. 3–5220–B, 3–4138–C.**

United States District Court,
N. D. Texas,
Dallas Division.

June 5, 1972.

Dallas Legal Services Foundation, Inc., Robert L. Byrd, Sam K. Eck, John

F. Jordan, Jesus B. Ochoa, Jr., Dallas, Tex., for plaintiffs; Stanley A. Bass, NAACP Legal Defense Fund, New York City, of counsel.

John B. Tolle, Asst. Dist. Atty., Dallas, Tex., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

HUGHES, District Judge.

This civil rights suit considers conditions of life experienced by prisoners at the Dallas County jail. The plaintiffs, Joseph Taylor, James Douglas Thompson and John Henry Woods, Jr., are inmates at the Dallas County jail. They have brought this action for themselves and as representatives of a class comprising all the inmates of the jail.

The defendants are Dallas County officials charged with responsibility for the maintenance and supervision of the jail: W. L. Sterrett, County Judge; Mel Price, John Whittington, Jim Tyson, and Roy Orr, members of the Commissioners Court; Clarence Jones, Sheriff; Carl Rowland, Chief Jailer; and J. N. Pickard, M.D., Dallas County Health Officer. The Court acquired jurisdiction over this action pursuant to 28 U.S.C. § 1343 which authorizes a federal district court to hear actions under 42 U.S.C. § 1983 to redress any deprivation, under color of state law, of any right, privilege or immunity secured by the Constitution. The plaintiffs seek declaratory and injunctive relief under 28 U.S.C. § 2201 against certain acts, practices, policies and conditions at the Dallas County jail.

Prior to the hearing on the merits of the complaint, this Court issued a permanent injunction concerning the practice of censorship of the mail by jail officials. The Court ordered the Sheriff to cease opening or censoring mail transmitted between inmates of the jail and the following persons: courts, prosecuting attorneys, probation and parole officers, governmental agencies, lawyers and the press.

Also during the pendency of this suit, the Court entered a preliminary injunction against the jail officials enjoining them from destroying certain reading materials to which the prisoners attached importance and which they do not wish to surrender, provided that the prisoners maintain the material in good condition and do not create a fire or health hazard. These materials included law books, legal materials, legal documents, books, magazines and newspaper clippings.

Before the trial on the merits, the Court visited the facilities of the Dallas County jail with the chief jailer and counsel for the plaintiffs and defendants. During these visits the Court became acquainted with the areas which are the subject of this suit. The Court's familiarity with the physical condition of the jail permits it to take judicial notice of certain matters presented during the trial.

Immediately prior to trial the case of Perry v. Decker, C.A.3–4138–C was consolidated with Taylor v. Sterrett. The Perry case complained of inadequacy of medical services and was brought by Julius Dwaine Perry an inmate of jail, for himself and as representative of the class of inmates similarly situated.

The plaintiffs have alleged in their complaint a long list of deprivations which they contend constitute individually and collectively a violation of their rights protected by the first, eighth and fourteenth amendments of the Constitution. In addition, the plaintiffs declare that the defendants have failed to comply with State law regarding the operation and supervision of the county jail. The constitutional questions raised by the complaint are substantial and require the intervention of the Court to assess the charges and to redress any infringement on the rights of the class. The Court takes cognizance of the strong pressures on it to abstain from reviewing matters involving prison administration and policy. "It is a rule grounded in necessity and common sense, as well as authority, that the maintenance of discipline in a prison is an executive function with which the judicial branch

ordinarily will not interfere." Sewell v. Pegelow, 291 F.2d 196, 197 (4th Cir. 1961). Although the federal courts are reluctant to interfere with the internal operation of jails, the claims made by the plaintiffs in the present case do not involve mere matters of preference or convenience concerning administrative practices. The allegations raise basic questions of constitutionally protected rights.

The Court recognizes that the plaintiffs are prisoners held either for conviction of a crime or under charge of a crime. Although the courts have acknowledged that prisoners have obvious limitations placed on their privileges and rights, "it is well established that prisoners do not lose all their constitutional rights and that the Due Process and Equal Protection Clauses of the Fourteenth Amendment follow them into prison and protect them there from unconstitutional action on the part of prison authorities carried out under color of state law." Washington v. Lee, 263 F. Supp. 327, 331 (N.D.Ala.), aff'd sub nom., 389 U.S. 967, 88 S.Ct. 457, 19 L.Ed. 2d 457 (1967). Furthermore, when the rights of those prisoners who are held as pretrial detainees are in question the courts have subjected the cases to even closer scrutiny. Anderson v. Nosser, 438 F.2d 183 (5th Cir. 1971).

### PHYSICAL FEATURES— CROWDING

The Dallas County jail is located in two buildings referred to as the old jail and the new jail. The new jail is located in the new County Government Center. It was designed to accommodate 1220 inmates at capacity. The quarters now in use in the two buildings has a total capacity for 1370 inmates. During the first fourteen days of May 1972, the peak number per day varied from 1491 on May 6th to 1693 on May 4th. The average peak number for the fourteen days was 1589. During 1971 the average daily number housed during three months of the year was more than 1700 and one month was more than

1800. The women's section located on one floor of the new jail consists of 25 cells containing 198 bunks. On the day of the trial there were 92 female inmates, leaving more than 100 bunks unoccupied. The failure to use all the bunks on this floor results from design problems which do not provide adequate segregation of male and female prisoners. The vacancies on the women's floor increases the crowding of the cells reserved for men.

Most of the inmates are lodged in cells each with 8 to 12 bunks which open into a "day room." The entire area is referred to as a "tank", the capacity of a tank varying from approximately 24 to 36. In addition to ten tanks there are 168 cells without a day room each containing several bunks. These open into a corridor.

All tanks for men are overcrowded having approximately 15 more inmates than the number of bunks. Those not assigned to bunks sleep on mattresses in the day room. The hospital ward for men is likewise overcrowded and it is common for men to sleep on mattresses in place of beds. Its capacity is 48. On the day of the Court's visit there were 62 persons who had been admitted.

At the time the new jail was built in 1966 the old jail was abandoned and became unusable for the detention of prisoners. It soon became apparent that the new jail was inadequate, but no steps were taken to repair or remodel the facilities in the old jail until 1971. Early in 1972 a part of the old jail was opened and some prisoners transferred to it. Presently 150 inmates are lodged there. By remodeling and removing stored items an additional 550 men could be housed. In addition to the possibility of use of all quarters in the old jail the Sheriff reported that the 100 extra bunks in the women's section could be used for men by changing the floor plan.

In addition to the tanks and cells without day rooms the jail has a number of solitary cells, which are completely inadequate, used for punitive segregation and insane prisoners. Six have dimen-

sions of 4′ 3″ x 5′ 1″. The rest measure 6′ 11″ x 5′ 1″ and 7′ 1″ x 6′. Only four have running water. None have drinking fountains. The only facility for excrement is a hole in the floor which is rarely flushed. There is no outside light, the inside electric globe burning 24 hours a day. Mattresses are used in place of bunks. The only place to sit is on the floor or mattresses. Insane persons are placed in the solitary cells without the benefit of padding on the walls or a hammock for sleeping.

## MEDICAL FACILITIES

The medical care facilities consist of an infirmary for men with 48 beds and one for women with 18 beds. There is provision for a nurse to be on duty 24 hours each day. In addition there is a doctor on call throughout the day. Previously requests by inmates for the nurse have been ignored, but recently a policy has been inaugurated of sending a note, termed a "kite", to the nurse immediately. Until recently the only dental care has been tooth extraction. The program has now been expanded to include filling. Examination of inmates is not adequate —when admitted they are tested only for tuberculosis and for venereal disease if suspected. Food handlers receive no examination.

## PRACTICES, POLICIES and PROCEDURES

### Censorship

Prior to the filing of this suit, the chief jailer enforced a policy of opening and reading each item of mail which was transmitted between prisoners and the outside. The stated purpose of this procedure was to insure security and to prevent the transmission of contraband. The jailer in charge of this procedure would read all of the inmate mail and had authority to refuse to send those letters which he found unacceptable for outside mailing. If there was matter in the letters which did not meet his approval, the jailer returned the letter to the inmate for rewriting. All letters had to be submitted to the jailer unsealed.

The first action taken in the present case was to enjoin the Sheriff from continuing this procedure as it applies to certain categories of mail. The inspection of the mail between the inmates and the persons or agencies set out in the order is now limited to superficial examination for possible contraband.

The testimony of Chief Rowland revealed that since the first of the year his department has stopped the censorship of all mail and has limited its inspection to merely discovery of money or contraband which could be transmitted. In his opinion, the practice of censorship of the mail had little impact on the security of the jail.

### Reading Matter

The inmates of the jail have access to periodicals and books by purchasing them off the commissary cart and through mail subscriptions. The reading matter sold from the cart is limited to a list of items approved by the Sheriff. The alleged criteria for the periodicals are (1) that they contain no pictures of nude persons and (2) that there be no pictures of weapons. The Sheriff or the chief jailer has the sole authority to decide what books or periodicals are admitted to the jail.

The plaintiffs presented at trial evidence of magazines which are sold from the cart, yet do not conform to the stated policy of the jail. There were several with pictures of nude women and guns and stories of crime. Furthermore, inmates have been refused permission to have magazines which do not violate the two criteria.

### Jail Rules and Discipline

Previously there have been no written rules relating to conduct in the jail, and inmates were not advised of any unwritten rules. Infraction of rules was punished by a supervisor on complaint of a guard or of a corridor boss who is merely an inmate chosen by the supervisor. It was not required that the inmate be

advised of the charge and he could be placed in solitary, without a hearing, for an indefinite time. There was no provision for review.

The Sheriff testified that new rules have been promulgated and will be posted in each tank and in the corridors. New prisoners will likewise be given a copy. As of the date of the trial the rules had not been posted and even the Chief Jailer was unaware of their existence.

The Sheriff has likewise proposed a formal procedure for handling infractions of the rules. Under this procedure the guard or other jail personnel who witnesses the infraction must submit a written statement of the offense which is directed to a supervisor who reviews the report and then assesses the punishment. The prisoner is presented with a copy of the charge and the disposition made by the supervisor. On the back of the report the Sheriff has listed an appeals procedure which the prisoner may initiate after the supervisor has acted. There is no provision for notice of the charge prior to action by the supervisor and one member of the Appeals Board is the Jail Supervisor taking the punitive action. As of the trial this new procedure had not been put into effect.

### Recreation & Exercise

There is no area or program for exercise and recreation for inmates in the jail. The prisoners are confined to their cells for the duration of their sentences or until their trial. While a prisoner is waiting on post conviction appeals, he remains in the jail and it is not uncommon for prisoners to be in jail for several years while the appeal is being considered.

When a person is placed in jail he is forced to remain in a cell with no opportunity to engage in recreational activities other than reading and playing cards and dominos. The prisoners have no exposure to either sunlight or fresh air. In the new jail, the only outside light is transmitted through translucent windows. Artificial light is so poor that reading presents difficulties. The over-crowded cells, poor ventilation, poor lighting and lack of exercise all contribute to the physical deterioration of the inmates and these factors also tend to heighten their frustrations and anxieties. There is no opportunity to burn off surplus energy other than by mischievous conduct.

### Rehabilitation and Counseling

Prior to the filing of this suit, there was no program of rehabilitation or education at the jail. There is no effort to influence the lives of the inmates in any positive manner. The county performs an exclusively custodial function of placing the accused and the convicted into crowded cells and letting them vegetate until their release. The county officials have completely ignored the rehabilitative role the jail should play in the criminal justice system.

In the past months the Chaplain has begun a small pilot program of teaching selected prisoners some rudimentary educational subjects. There is, however, no established program of evaluating the needs of the inmates and then providing them with education, vocational training or counseling.

There are no trained counselors for the inmates other than the voluntary work done by the chaplains. Men do not have the privilege of attending religious services. The only religious service available is for the chaplain to come into the tank and speak. The practice of the jail is totally devoid of any constructive measures which might act on an individual prisoner to influence him to become a contributing member of society. The inmates are relegated to the dehumanizing existence of idle isolation in a cage. The fundamental objective of correctional institutions, that of rehabilitation, has been subordinated to the limited goal of punishment and security.

### Classification and Segregation of Prisoners

The inmate population of the Dallas County jail consists of arrestees, persons convicted of misdemeanors serving their sentence, convicted felons awaiting ei-

ther a decision on appeal or transfer to the Texas Department of Corrections, and federal prisoners awaiting trial. The jail officials, however, have not made any attempt to segregate the various classes of prisoners in any meaningful way. The Sheriff testified that he was instituting a system of classification based on a maximum, medium, and minimum security risk standard. At the present time, however, this program has not been implemented. The inmates of the jail are assigned to cells on the basis of their name, that is, by alphabetical order.

The pretrial detainees in most instances experience treatment similar to that accorded convicted criminals, but in some respects they are in a worse position. They are not permitted to engage in the limited educational program at the jail, and they are not allowed to work in the relative freedom of the trusty job. Ironically, when one compares the opportunities for education, recreation, and training at the Texas Department of Corrections to the total lack of any programs at the Dallas jail, the obvious conclusion is that these technically innocent individuals suffer worse punishment in the jail than the convicted in the penitentiary. Ostensibly, the chief purpose of placing the arrestee in jail is to guarantee his appearance at trial. His incarceration is, in most instances, because he cannot afford to pay a bondsman. The result is that pretrial detainees are subjected to the demeaning confinement in the jail without trial solely because they lack money.

The plaintiffs have alleged that the jail officials enforce a policy of racial segregation of the prisoners. The Sheriff denies that there is a policy of racial segregation, but he admitted that there are a number of tanks which are all black or all white. In the visit of the Court to the jail, there was almost complete segregation of blacks and whites.

*Guards*

The Sheriff testified in the trial that one of the major restrictions on providing any meaningful programs for the inmates is the lack of adequate supervisory personnel. There are 99 guards divided into three shifts. While the guards are on duty, they supervise the five floors of the new jail aand the old jail which together house more than 1500 persons. On account of the high ratio of prisoners to guard the role of the guard is limited to housekeeping and to security measures such as controlling inmate conduct and preventing escapes. According to the Sheriff, the small staff has resulted in restrictions being placed on the privileges of inmates to use telephones and on coordinating visiting sessions and has likewise prevented the development and coordination of recreational, educational, and vocational training programs.

*The Cop-out System*

During the trial of this action, the plaintiffs raised a constitutional question regarding the practice of admitting investigators into the jail to interview the inmates concerning their plea on the charges for which they are held. The investigators, called cop-out men, are individuals hired by the District Attorney and assigned to particular State courts. Their chief role is to work out an agreeable recommendation for punishment to be presented by the District Attorney if the inmate pleads guilty. As a matter of policy, the investigators will not discuss a plea or punishment with an inmate who has a lawyer unless the lawyer is present. If the inmate has no lawyer, the cop-out man interviews him, regardless of whether the inmate has requested the interview. Although the investigators are not part of the Sheriff's staff, they are given relatively free access to the jail and the inmates. The plaintiffs have asked that the Sheriff be enjoined to restrict the access of cop-out men to the prisoners except when the prisoner makes a specific request for an interview.

## APPLICABLE LAW

This action is primarily a class action. While there was testimony relating to individual grievances this memorandum

opinion and judgment relates only to the abuses and deprivations common to all inmates.

### Texas Statutory Requirements

The Texas legislature has provided for certain minimum standards for county jail facilities.[1] In the statutes, the legislature has charged the Commissioners Court with the ultimate responsibility for providing "safe and suitable jails." The laws also state that the sheriff is to be the keeper of the jail, with the right to delegate the responsibility to a jailer who will be under his supervision and control.

The statute requires that the jail provide for adequate segregation for the prisoners. The county must separate "first offenders, awaiting trial, from all classifications of convicted prisoners." As heretofore stated there is no segregation of pretrial detainees from other inmates in the Dallas jail. Although there is some segregation of those suspected of insanity from other inmates, the facilities for housing do not comply with the statute.

1. Article 5115 of the Vernon's Texas Revised Civil Statutes Annotated provides in pertinent part as follows:

The Commissioners Court shall provide safe and suitable jails for their respective counties, and shall cause the same to be maintained in good sanitary condition at all times, properly ventilated, heated and lighted . . .

### SUITABLE SEGREGATION

The term "safe and suitable jails," . . . shall be construed to mean jails which provide adequate segregation facilities . . . separating . . . first offenders, awaiting trial, from all classifications of convicted prisoners. . . .

[F]or . . . temporary holding of each person suspected of insanity, or who has been legally adjudged insane, there shall be provided a special enclosure or room, not less than forty (40) square feet . . .. Furthermore, the floor and the walls of such enclosure shall be provided with a soft covering designed to protect a violent person, temporarily held therein, from self-injury or destruction . . ..

### SUITABLE SECURITY AND SAFETY

For the purpose of this Act, the term "safe and suitable jails" is further defined to mean jails which provide adequate security and safety facilities by having separate cells or compartments, dormitories and day rooms, of varying dimensions and capacities for prisoners confined therein, except that, if practicable, no one such cell or compartment shall be designed for confining two (2) prisoners only. Cells or compartments shall be designed to accommodate from one (1) to eight (8) prisoners each, and furthermore, such dormitories and day rooms shall be designed to accommodate not more than twenty-four (24) prisoners each . . .. All cells, compartments and dormitories for sleeping purposes, where each such cell, compartment or dormitory is designed to accommodate three (3) or more prisoners, shall be accessible to a day room to which prisoners may be given access during the day. Cells for one (1) prisoner only shall have a minimum floor area of forty (40) square feet and all other cells, compartments, dormitories and day rooms . . . shall have minimum floor area equal to eighteen (18) square feet for each prisoner to be confined therein.

### SUITABLE SANITATION AND HEALTH

The term "safe and suitable jails" is further defined to mean jails which provide adequate facilities for maintaining proper standards in sanitation and health. Each cell designed for one (1) prisoner only shall be provided with a water closet and a combination lavatory and drinking fountain, table and seat. Each cell, compartment or dormitory designed for three (3) or more prisoners, shall be provided with one (1) water closet and one (1) combination lavatory and drinking fountain for each twelve (12) prisoners or fraction thereof to be confined therein. Furthermore, all such cells, compartments and dormitories shall be provided with one (1) bunk, not less than two (2) feet, three (3) inches wide and six (6) feet, three (3) inches long, for each prisoner to be confined therein. Furthermore, each day room for the confinement of three (3) or more prisoners shall be provided with one (1) water closet, one (1) combination lavatory and drinking fountain and one (1) shower bath for each twelve (12) prisoners, or fraction thereof, to be confined therein. Furthermore, each day room shall be otherwise suitably furnished.

Article 5115 sets down the minimum standards on the dimensions and capacities of the cells in county jails. Solitary cells are to have a minimum of 40 square feet, and larger cells must have a minimum of 18 square feet per prisoner. The law prescribes that 24 is the maximum number of prisoners which may be placed in a "tank."

The sanitation and health requirements for jails include the provision of at least one water closet and combination lavatory and drinking fountain for each 12 prisoners or fraction thereof. In addition, the law requires that there be a shower for each 12 prisoners and another water closet and fountain for each day room. Each inmate must be provided a bunk.

The defendants have been quite candid in their admission that the county does not provide facilities which conform to article 5115. Furthermore, they do not contest the pendent jurisdiction of this Court to adjudicate the State law question. The failure to provide the necessary space to house the prisoner population is one of the chief causes of the deprivations which the inmates experience. Living in the overcrowded cells with less than minimal sanitary facilities has a dehumanizing effect on the persons subjected to these conditions. Already this year the Dallas jail has witnessed a riot of inmates protesting the substandard and inhumane conditions.

■ The charges of inadequate medical treatment and the use of the solitary cells arise in large part from the deficiencies in the physical facilities. The overcrowding of the infirmary prevents the treatment of many who should be admitted and the lack of space makes the proper care impossible. The use of the solitary cells is one of the significant challenges of the plaintiffs. The plain-

tiffs have charged that confinement in the small cells with no sanitary facilities or running water constitutes cruel and unusual punishment and a violation of due process. By the defendants' own admission, the cells do not meet the minimum requirements of the State statute. The Court, therefore, is not compelled to apply subjective criteria such as "unnecessary cruelty," [2] "standards of fairness and justice," [3] and "evolving standards of decency" [4] to decide the question of cruel and unusual punishment. The statute provides an objective basis for judging the jail facilities, and the Dallas jail does not withstand the test of the local law.

The County Health Officer testified that the inmates working in the kitchen did not have health certificates. Article 705d of the Vernon's Ann.Texas Penal Code requires that food handlers have an examination by a licensed physician to detect the presence of communicable diseases.

*Eighth Amendment*

In addition to violating State statutes, the plaintiffs contend that the county officials subject them to cruel and unusual punishment prohibited by the eighth amendment because of the imposition of the following conditions: overcrowded cells and tanks necessitating sleeping in day rooms and corridors; the use of inadequate and unsanitary solitary cells; unclassified assignment to tanks and cells; lack of physical exercise and of a rehabilitation program; supervision of inmates by other inmates called corridor bosses; inadequate medical facilities; the lack of rules of conduct and rules for discipline procedures.

In the past the courts limited their review under the eighth amendment to isolated incidents involving physical brutality.[5] The focus has been on a par-

2. Wilkerson v. Utah, 99 U.S. 130, 136, 25 L.Ed. 345 (1878).

3. Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 470, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (Frankfurter, J., concurring).

4. Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

5. *See*, e. g., Wiltsie v. California Dep't of Corrections, 406 F.2d 515 (9th Cir. 1968); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966); Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965).

ticular practice and not on a broad view of the system as the cause of the punishment. Recently the courts have expanded their examination of the charges of cruel and unusual punishment giving consideration to the effect of a "combination of circumstances" upon the contested act, practice or system.[6]

They have placed emphasis on the role of the eighth amendment as it applies to overall prison conditions which have been found detrimental to the mental and moral well being of inmates as well as being physically debilitating.[7] As early as 1910 the Supreme Court in Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793, held that the eighth amendment ". . . is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." *Id* 378, 30 S.Ct. 553. The Court declared further that it was the intent of the drafters of the amendment that it cover ". . . exercises of cruelty by laws other than those which inflicted bodily pain or mutilation." *Id.* 372, 30 S.Ct. 551. In Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) the Court concluded that the eighth amendment applies to the states.

The emphasis on nonphysical concepts of cruel and unusual punishment gained impetus in the courts as it is applied in a correctional context in the case of Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968). Although this case considered the use of physical punishment on inmates, the Court condemned such punishment because of its lack of rehabilitative potential.

> "Corporal punishment generates hate toward the keepers who punish and toward the system which permits it . . .. It frustrates correctional and rehabilitative goals . . .. Whipping creates other penological problems and makes adjustment to society more difficult." *Id.* at 580.

The trend toward examining programs for rehabilitation in conjunction with physical abuses and inhumane treatment has been articulated in the decision of Holt v. Sarver, 309 F.Supp. 362 (E.D. Ark.1970) which declared the entire Arkansas prison system violative of the eighth amendment constituting cruel and unusual punishment.

The Arkansas prison system displayed shocking practices of brutality and injustices perpetrated on prisoners. The Court was confronted with numerous practices which even in isolated use would have constituted cruel and unusual punishment. In spite of the obvious cruelty in the practices, the Court also placed emphasis on them in the context of the system's failure to offer any program of rehabilitation and to prepare inmates for release. In this connection it stated:

> "The absence of an affirmative program of training and rehabilitation may have constitutional significance where in the absence of such a program conditions and practices exist which actually militate against reform and rehabilitation . . .. [T]he absence of rehabilitation services and facilities . . . remains a factor in the overall constitutional equation . . .." 309 F.Supp. 379.

Holt v. Sarver is a recognition of one of the mostly widely regarded theories of penology that restraint and retribution have a tendency to produce recidivism in the inmates upon their release. The report of the President's Commission on Law Enforcement and Administration of Justice; The Challenge of Crime in a Free Society (1967) had this to say with reference to our penal institutions:

> "Life in many institutions is at best barren and futile, at worst unspeakably brutal and degrading. To be sure, the offenders in such institutions are incapacitated from committing further crimes while serving their sentences, but the conditions in which

---

6. See Novak v. Beto, 453 F.2d 661, 675 (5th Cir. 1971) (Tuttle, J., concurring in part and dissenting in part).

7. *See*, e. g., Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971).

they live are the poorest possible preparation for their successful re-entry into society, and often merely reinforce in them a pattern of manipulation or destructiveness." *Id.* 159. Rehabilitation must be the overriding goal of our correctional institutions. Unless society subordinates all of the correctional purposes to the goal of rehabilitation, it faces the paradox of promoting the production rather than the reduction of crime.

Another important deficiency in the Dallas jail program is the lack of any program for recreation or exercise. The Chief Justice of the Supreme Court, Warren E. Burger, has stated that recreation is a necessary concomitant with education in our prisons. He recognized that one of the more pervasive evils in our correctional institutions is idleness and gave this admonition concerning the lack of programs in our jails:

> "Playing cards, watching television or an occasional movie (the Dallas jail has no video recreation), with nothing more, is building up to an expensive accounting when these men are released—if not before. Such crude recreation may keep men quiet for the time, but it is a quiet that is ominous for the society they will try to re-enter." [8]

The lack of physical exercise has been considered by the Courts in the context of being cruel and unusual punishment. In Sinclair v. Henderson, 331 F.Supp. 1123 (E.D.La.1971), the Court reviewed the charge that the failure to afford inmates confined on Death Row an opportunity for exercise was a violation of the eighth amendment. It noted the decision in Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970), which required the State to provide outdoor exercise to prisoners and concluded that "[c]onfinement for long periods of time without the opportunity for regular outdoor exercise, does, as a matter of law, constitute cruel and

unusual punishment . . . ." 331 F. Supp. at 1131.

■ The plaintiffs have challenged the use of the punitive segregation cells as a violation of the eighth amendment. As heretofore stated in the discussion of the State law, most of the cells do not conform to the standards provided in the statute. In Novak v. Beto, 453 F.2d 661 (5th Cir. 1971) rehearing denied en banc, 456 F.2d 1303 (5th Cir., 1972), the Court considered the propriety of the use of solitary confinement at the Texas Department of Corrections. In that case the facility in question conformed to the physical requirements of the statute. In upholding the use of the solitary cells, the majority placed great weight on the fact that the cells were sanitary and there was no "deprivation of basic elements of hygiene." *Id.* at 665. The *Novak* case is clearly distinguishable from the situation at the Dallas jail. Here there are no sanitary facilities, the cells are smaller than the statutory requirement and there has been in the recent past the practice of placing the inmate in the cell nude and on bread and water diet. The use of the substandard facilities at the Dallas jail for punitive segregation or any other purpose would constitute cruel and unusual punishment.

*Fourteenth Amendment*

The plaintiffs have asserted that the practices and policies of the jail in relation to discipline procedure for infraction of the rules, particularly with reference to pretrial detainees infringes on their civil rights protected by the fourteenth amendment. There are several recent cases bearing on this subject.

In Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971) inmates of a Virginia prison complained of the manner in which punishment was inflicted. The Court held that in adjudicatory proceedings "certain due process rights are both necessary and will not unduly impede legitimate prison functions." *Id.* 653.

---

8. Address by Chief Justice Warren E. Burger, National Conference on Corrections, Dec. 7, 1971.

Two of these requirements the Court declared were: "First, the decision to punish must be made by an impartial tribunal . . . Second, there shall be a hearing." *Id.* 653.

Sinclair v. Henderson, 331 F.Supp. 1123 (E.D.La.1971) was a case involving discipline of prisoners on death row in a Louisiana prison. The Court held (1) there must be rules officially promulgated and communicated to the prisoner (2) the prisoner must be given official written notice of the specific charge against him (3) before serious punishment, such as punitive segregation, can be imposed, the prisoner must be given a hearing at which he shall have an opportunity to be heard (4) the imposition of punishment should be made by one other than the accusing guard.

■ These two cases deal with convicted felons confined in prison. The inmates of the Dallas jail in addition to those serving sentences for misdemeanors includes pretrial detainees and men whose sentences are on appeal. All are entitled to due process in the assessment of punishment.

It is, however, not necessary that the procedure for inmates in all institutions to receive exactly the same treatment in order for their rights to be protected. There is no question in this case or in *Landman* and *Sinclair* of the power of the person in charge to discipline the inmates. The proper operation of the institution requires order. It is recognized that when rules are violated there is need to act quickly and in a way that will not disrupt the security of the jail and the safety of the other inmates. It seems reasonable to place inmates in solitary for short periods of time without a hearing in case of certain violations and such action would not be a violation of rights under certain circumstances.

■ ■ The procedure rules for discipline promulgated by the Sheriff appear to be reasonable except that an inmate who is confined in a solitary cell for more than three days should have a hearing and if an appeal is taken the person

charging the inmate should not be on the Board. The Sheriff is likewise to be complimented for limiting the maximum time in solitary to fifteen days when heretofore it has been unlimited.

■ The recent en banc decision of Anderson v. Nosser, 456 F.2d 835 (5th Cir. 1972) holds that confinement of arrestees under the conditions existing in a Mississippi prison were a violation of due process. Here conditions are not similar and we do not hold that the mere confinement of the inmates in the Dallas County jail is a failure of due process.

## CONCLUSION

The correctional programs and facilities of the Dallas County jail are in desperate need of upgrading and expansion. The county does not provide the minimum facilities required by law. The policy of the county has been to confine the accused and the convicted as inexpensively as possible thereby preventing their circulation in society. Punishment results from the inadequate facilities and unpleasant experience. The present jail system serves no other purpose.

The local jail performs the unique role of being a misdemeanant institution, that is, an institution for persons charged with petty crimes with short sentences. The local jail is the only correctional institution to which the misdemeanant is associated, but the term correctional is a euphemism. Dallas County has shown complete indifference to its responsibility to attempt rehabilitation of those offenders charged to its care.

The Sheriff and chief jailer in recent months made an effort to change some of the deficient conditions at the jail. For these efforts they are to be commended. The county has begun renovating the old jail; medical and dental programs have been upgraded; censorship of mail has been limited; punitive segregation has been limited to 15 days; the disciplined prisoner is not deprived of his clothing; a pilot remedial education program is underway; and the inmates have increased telephone and visitation privileges.

■ The Sheriff has stated that he is prepared to initiate more programs and to improve the jail, but he is handicapped by a small staff and small budget. There is no quantitative statement of the costs which the necessary improvements will require. This Court recognizes that enlarging the jail will be costly, but "inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights." Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971).

The injunctive order provided herein is, of course, only the minimal action which is required. The Court is encouraged by the apparent good faith and interest of the Sheriff's Department in providing a "safe and suitable jail." Although this Court does not invite judicial review of jail administration, it is hoped that public attention to jail conditions which this action has produced will stimulate interest in the community to do something about our jails. The recent events at Attica, New York and the disturbance at the Dallas jail should be warnings of the need to re-examine and upgrade correctional programs. The costs for making the changes may be substantial. But the consequences of inaction are greater.

In view of the foregoing conditions at the Dallas County jail, it is the Judgment of this Court:

1. The Commissioners Court is enjoined from further violating the provisions of Article 5115 of the Texas Revised Civil Statutes and is directed to provide immediately as follows:

a. Sufficient cells and tanks to accommodate a number of inmates equal to the largest number in the Dallas County jail during 1972 in any one day.

b. Solitary cells of not less than 40 sq. feet, provided with a bunk, water closet and a combination drinking fountain and lavatory.

c. The capacity of the hospital ward for men shall be increased and bunks provided for all patients confined therein.

d. Padded cells with hammocks for insane persons.

It is suggested in this connection that the old jail be renovated and the women's floor in the new jail be redesigned to accommodate both male and female inmates. A reasonable time for the completion of these improvements in the opinion of the Court is six months. Even with such remodeling and repairs the provisions of Article 5115 will not be wholly complied with. The Court directs that the Commissioners Court make immediate plans for full compliance within a reasonable time. A Regional Jail is a possible answer to the complete fulfillment of these requirements but plans for a Regional Jail are not sufficient reason for the failure to implement all the statutory provisions for a "safe and suitable" jail as required by Article 5115.

2. The Commissioners Court is directed to provide an outdoor area for exercise and a rehabilitative program of recreation. As a temporary arrangement it is suggested that the roof of the jail be remodeled to provide for such facilities, the possibility for which was suggested by the Sheriff. In a permanent plan for new facilities, quarters should be provided for chapel services and educational programs.

3. The Commissioners Court is directed to provide jail guards sufficient for security for jail facilities without the use of inmate assistance.

4. The permanent injunction heretofore issued relating to censorship of mail is affirmed and carried forward in this judgment. The Sheriff is directed not to open or censor mail transmitted between inmates of the jail and the following persons: courts, prosecuting attorneys, probation and parole officers, governmental agencies, lawyers and the press.

5. The preliminary injunction, heretofore issued relating to the destruction of reading matter belonging to inmates is made a permanent injunction and the Sheriff and other jail officials are enjoined from destroying law books, legal

materials, legal documents, books, magazines and newspaper clippings provided such material is maintained in good condition and does not create a fire or health hazard.

6. While this Court will not interfere in the standards set up by the Sheriff for inmates receiving magazines or books, it appears that the policy has not been adhered to and the Sheriff is directed to see that greater care is exercised in determining the books and magazines made available to inmates so as to permit inmates to have reading material not prohibited and to restrict the receipt by inmates of prohibited material.

7. The Sheriff is directed to make effective the new policy relating to rules of conduct of inmates. These rules must be communicated to the inmates apprising them of what conduct can subject them to discipline, the penalty for infraction and the procedure by which such a determination will be made. Before any punishment for confinement of more than 3 days in solitary is inflicted hearings should be held. In case of the appeal of any sentence, the officer charging or sentencing the inmate should not be a member of the Board of Appeals.

8. The Sheriff is directed not to allow persons to see prisoners except with the consent or request of the inmates. This has particular reference to "cop-out" men, who have had free access to the jail.

9. The Sheriff is directed to inaugurate a classification system taking into consideration security, integration and status of inmates as to whether they are pretrial detainees or convicted inmates.

10. The Sheriff is enjoined from using inmates as corridor bosses to enforce rules and preserve discipline.

11. The Sheriff is directed not to use any cell of less than 40 square feet, not to place more inmates in cells and tanks than those such facilities are designed to accommodate, nor to place anyone in a solitary cell unless it is provided with a bunk, water closet and a combination fountain and lavatory.

12. The Sheriff is directed to have employees and inmates handling food examined by a licensed physician to detect the presence of communicable diseases as required by Article 705d of the Texas Penal Code.

Attorneys fees are denied. Costs are taxed against Defendants.

While this opinion closes this case it may be reopened within a reasonable time on application of the plaintiffs contending that Defendants are not making a diligent, good faith effort to comply with the order of this Court.