Guy Zepth AMBROSE et al., Plaintiffs,

v.

Benjamin J. MALCOLM, Commissioner of Correction of the City of New York, et al., Defendants.

No. 76 Civ. 190.

United States District Court,
S. D. New York.

June 4, 1976. .

William E. Hellerstein, The Legal Aid Society, New York City, for plaintiffs; Joel Berger, David A. Englander, Steven A. Herman, Michael B. Mushlin, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for defendants; Donald J. Tobias, New York City, of counsel.

LASKER, District Judge.

New York City presently operates four detention facilities for men: The House of Detention for Men at Riker's Island (HDM), the Queens House of Detention (QHD), the Brooklyn House of Detention (BHD) and the Bronx House of Detention (BXHD). A fifth, the Manhattan House of Detention (MHD), commonly known as the Tombs, was closed in December, 1974, but an application to reopen it is pending in this court (*Rhem v. Malcolm*, 70 Civ. 3962). In recent years a spate of litigation has challenged the constitutionality of the conditions under which pre-trial detainees have been held at these institutions. This suit, the latest in the array, is brought by detainees at BXHD—the only jail as to which such a test had not been made. As in the earlier suits, the plaintiffs here are inmates of the institution in question, and the defendants include the Commissioner of Correction, Warden of the jail and Mayor of the City of New York.

On January 14, 1976, the plaintiffs moved for a preliminary injunction prohibiting defendants from housing more than one inmate in a cell at BXHD and more than 24 inmates in a dormitory.[1] Plaintiffs contended that the ruling of the Court of Appeals for this Circuit in *Valvano v. Malcolm*, 520 F.2d 392 (2d Cir. 1975) compelled granting of the requested relief as to both celled and dormitory inmates. The defendants agreed that *Valvano* was conclusive as to celled detainees, and accordingly committed

---

1. Dormitories at BXHD are located on the 3rd through 6th floors and were added to the building by construction of a new wing in 1961. There are two dormitories on each floor, adjacent to each other.

themselves not to house more than one man to a cell at BXHD. However, they contested the applicability of *Valvano*—which dealt only with celled inmates—to BXHD's dormitories. Since analysis of *Valvano* supported defendants' position—at least to the extent that its holding did not automatically prescribe the standards for determining when overcrowding in a jail dormitory became constitutionally impermissible—and since questions of fact significantly affected a decision of that issue, an evidentiary hearing was held and the court visited the BXHD dormitories in the presence of counsel and the Warden of the jail.

Plaintiffs' witnesses included two plaintiff detainees, Michael Benetti and Faruk Abdul Ghani; Dr. Donald Goff, Director of the Prisoners' Rights Project of the United States Commission, and Susan Saegert, Assistant Professor of Environmental Psychology at the Graduate Center of the City University of New York. Defense witnesses included John Buchholz, Director of Engineering of the Department of Corrections; Paul Silver, Adjunct Professor of Architecture at CUNY and a partner in the architectural firm of Gruzen & Partners; Gerald Mitchell, a dormitory Correction Officer at BXHD; Patrick Perry, Assistant Deputy Warden at BXHD and Jonathan Friedman, Professor of Psychology at Columbia University.

### The Issues

■ Overcrowding of inmates in a penal institution is an unconstitutional deprivation of due process. This proposition, discussed at length below, has been definitively determined, particularly as to pre-trial detainees, in this Circuit in *Valvano, supra*, and in such cases, cited with approval in *Valvano*, as *Taylor v. Sterrett*, 344 F.Supp. 411 (N.D.Tex.1972) *aff'd in part, rev'd in part*, 499 F.2d 367 (5th Cir. 1974); *Hamilton v. Love*, 328 F.Supp. 1182 (E.D.Ark.1971); *Jones v. Wittenberg*, 323 F.Supp. 93 and 330 F.Supp. 707 (N.D.Ohio 1971) *aff'd sub nom.*

*Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972) and *Hamilton v. Schiro*, 338 F.Supp. 1016 (E.D.La.1970). See also *James v. Wallace*, 406 F.Supp. 318 (M.D.Ala.1976); *McCray v. Sullivan*, 399 F.Supp. 271 (S.D. Ala.1976) and *Miller v. Carson*, 401 F.Supp. 835 (N.D.Fla.1975).

There is, however, substantial disagreement between the parties as to the standard by which to determine whether inmate housing has become impermissibly overcrowded. Plaintiffs contend that the decision turns on the "rated capacity" of the institution; that is, that except in emergencies it is unconstitutional to house inmates in greater number than its rated capacity. Accordingly, they seek to limit detainee population to that level. The City argues that the matter is to be judged by whether the number of inmates housed in a dormitory is such as to cause tension or aggressiveness among them.

### The Facts

Each single dormitory at BXHD has a rated capacity of 24 men and consists of a sleeping area of 1,650 square feet and a day room (for recreation and eating of meals) of 480 square feet. (Court Ex. 1) Although the defendants have stated that even if they prevail in this litigation, they will not house more than 60 inmates to any single dormitory, they have held population to a maximum of 40 since the hearing.

### A. Fact Witnesses

Michael Benetti and Faruk Abdul Ghani are both dormitory inmates at BXHD. On the day of the hearing there were 41 men in Benetti's and 35 men in Ghani's dormitory.[2] Their testimony canvassed the problems which housing in excess of rated capacity has caused. The approved plans for the BXHD dormitories provide for single beds for each inmate (Court Ex. 1). Because the total now housed exceeds rated capacity, a

---

**2.** The defendants have committed themselves not to house more than 40 men to a dormitory. Since the date of the hearing, on instruction of the court, a daily report has been made to the court as to population levels at BXHD. With very rare exceptions the population per dormitory has not exceeded 40.

significant number sleep in double bunk beds.[3] Double bunking provokes expectable difficulties—stepping by the upper bunker onto the lower in coming or going; inability to read in the lower for lack of light. More significant are limits of space between bunk rows which might be adequate for a population of 24 but prove narrow for the traffic of a 40 man group. Locker space is inadequate for present population, resulting in increased property thefts which aggravate tensions among inmates. Day rooms are crowded when 40 men in a dormitory eat meals at the same time, so that many inmates eat standing, sitting on the floor, or with trays in laps. Noise naturally increases as population increases, and late night conversations of inmates prevent others from sleeping. While many of these inconveniences are the natural concomitant of dormitory life they are seriously heightened when population is, as it presently is, 66⅔% above the rated capacity. Bizarre results ensue. For example, some men, including Benetti and Abdul Ghani, forego the single weekly gymnasium period allowed (although they desire the physical training it offers) so that they may enjoy the quiet of an emptied dormitory and write letters.

Benetti and Abdul Ghani also testified that because of excess population visiting procedures are slowed, and actual visiting time lessened.

Gerald Mitchell and Patrick Perry testified for the defendants. Both serve on the BXHD staff; Mitchell as a dormitory Correction Officer, Perry as second in command to the Warden.

Mitchell has worked the dormitories for a number of years. His testimony focused on the period 1972–73 when population averaged 45–60 men per dormitory. According to Mitchell even that level of population caused no significant problems as to such matters as shower or toilet use, air quality—which he said was no different whether there were 30 or 60 men in a dormitory—eating space in the day room, etc. As to

the last item, on visual inspection of the day rooms by the court there were not nearly enough chairs to allow seated eating; nor did it appear that the room could actually accommodate chairs for 40 men. It is therefore difficult to understand how the room could have afforded "ample" space (see Defendants' Post-Hearing Memorandum, p. 6) for "well in excess of 40 inmates per dormitory." Mitchell admitted that during earlier years of large population, the noise level had been high, but observed that it subsided "around 1:00 A.M."

Contradicting Abdul Ghani, Mitchell testified that he had observed inmates reading in lower bunks, although he did not specify how often this had occurred.

The impression left by Mitchell's testimony was of a sincere, well adjusted and loyal workman whose personal nervous system was not adversely affected by variations in the number of men in his charge; but doubts remained whether his own reactions were probative of the feelings of detainees who lived in a 24 man dormitory at a population level of up to 60 at a time. These doubts were heightened by Mitchell's admission on cross-examination that he spends 4 hours a day on the so-called "Bridge" area from which he cannot always see into corners of the sleeping area of the dormitory, and that few inmates make complaints or put questions to him. In fact, Mitchell and all correctional officers assigned to dormitories are forbidden by the institution's rules from entering the sleeping area of the dormitory without a "backup" officer present except in special circumstances.

More objective and to the point was the testimony of Patrick Perry. Perry presented a statistical study of all dormitory inmate infractions at BXHD in the years 1972 through 1975. According to Perry the study indicates that during the years in question, there was no demonstrable relation between dormitory population levels and the number of infractions. The figures presented were:

---

**3.** As of the date of hearing, in Benetti's dormitory, the two center rows of beds, six each, were double bunk accommodations. That is 24 of the 41 in that dormitory slept in double bunks.

| Year | Average Dorm Population (both sides of a floor) | Number of Infractions |
|------|------|------|
| 1972 | 83 | 106 |
| 1973 | 67 | 163 |
| 1974 | 45 | 77 |
| 1975 | 68 | 74 |

Although there is no reason to doubt the authenticity of these figures it is quite uncertain what they establish. Even if it be assumed that the definition of behavior constituting an infraction remained constant throughout this period, it is by no means clear that the figures demonstrate a lack of relationship between population and infraction (or tension or aggression) or that the sample of only four years is representative.

█ In any event, whatever conclusion may properly be drawn from the study its lesson is beside the point since, as discussed below, we conclude that the correct standard for determining constitutionally acceptable levels of prison population is the rated capacity of the institution, and not the number of infractions per man at varying population levels.

### B. Expert Witnesses

Donald Goff is presently Director of the Prisoners' Rights Project of the United States Commission on Civil Rights. His entire professional career has been spent in the field of Corrections, and he has served as Chief of the Bureau of Corrections of the State of New Jersey with responsibilities for the administration of the correctional institutions of the State, as well as jail lockup inspection for the State. Goff, a witness for the plaintiffs, supported inmate testimony that the use of double bunk beds caused inmate friction. In his view dormitory crowding at BXHD was aggravated because detainees are confined to the dormitories 24 hours a day except for rare recreation periods. BXHD does contain a gymnasium which would be quite adequate for limited numbers, but Goff noted that it is too small for its use by an entire dormitory floor at one time as is presently the case. Only one correction officer is assigned to each dormitory. Goff found his ability to keep the peace significantly limited when the dormitory was overcrowded, particularly if excess population did cause increased inmate tension.

Goff is well acquainted with professionally recognized standards of minimal "living space" per inmate—that is space for sleeping and other private purposes—supplemented by day room or recreation space. In Goff's view a reasonable minimum was 75 square feet total per man: the standard prescribed by the American Correctional Association.[4] Measured by the ACA standard, the BXHD's 2,130 square feet dormitories would accommodate a maximum of 28.4 inmates.

Goff is no stranger to BXHD. He has been acquainted with the institution at least since a time in the 1960's when he and others were consulted by the office of the Mayor to advise on a proposal to increase the rated capacity of City prisons. The proposal was rejected and the City still rates the capacity of the dormitories at 24,[5] as has been the case since they were built.

Goff testified that establishment of a rated capacity for a correctional institution was, as might be expected, an act of serious deliberation since it involved not merely a determination of space per man but a decision that feeding, recreation, visiting, sanitary and ventilation facilities could support the rated population.

Paul Silver, an architect, has participated in the design of many correctional institutions including the newly completed Federal Metropolitan Correctional Center (MCC) in New York City. He testified for the defendants. In his opinion the actual arrangement of inmate living areas was of

---

**4.** American Correctional Association, *Manual of Correctional Standards* 49 (1966). The ACA manual contains standards for prison facilities which are prepared by experts in the field of criminal justice and which serve as guidelines for the architectural planning of correctional institutions.

**5.** See Plaintiffs' Exhibit 2. Daily Census Form of Department of Corrections for January 1, 1976.

greater importance than the amount of space per man. He gave no view as to the number of inmates the BXHD dormitories were capable of housing.

While Silver testified that the addition of inmates above stated capacity would not automatically "overload" the institution's capacity to serve the population, he offered no conclusion as to the point at which additional population would overload the BXHD, and it is noteworthy that the plan of the Federal Metropolitan Correctional Center in New York City, which Silver and his firm designed, provides 128.78 square feet of sleeping space and nearly 30 square feet of living space for each inmate (1600 square feet for 54 inmates). (Plaintiffs' Ex. 3—drawing no. 21–1–9). On a comparable basis each BXHD half dormitory would house only 14 persons.

Silver recognized the standards of the ACA as a guideline prepared by a group of acknowledged experts in the field of criminal justice, and as a criterion used by architects in prison planning.

In spite of the much larger sleeping space per detainee available at the MCC which he and his firm designed, Silver stated that a minimum of 40 square feet per inmate might be acceptable, but as a tradeoff ample space for activities (living space) would be required; and Silver testified that at BXHD the only activities he observed were TV, cards, checkers, chess and "conversation." The 480 square feet of living space at BXHD provides 12 square feet per man for the 40 presently being housed there, and 20 square feet at the rated capacity of 24 men. These figures contrast with the 25 square feet specified by California's standards, 35 by Michigan and 35–40 prescribed by the National Clearing House on Criminal Justice planning all of which were referred to by Silver.

Jonathan Friedman, a Professor of Psychology at Columbia University is a special-ist on the effects of crowding. In addition to being the author of scholarly papers in the field, he has most recently published the book *Crowding and Behavior: The Psychology of High-Density Living* (The Viking Press, Inc. 1975).

Professor Friedman's credentials as an analyst of the effect of crowding in a variety of situations are impressive; but he does not claim to have studied the effects of crowding in the special circumstances of prison life, and the conclusions he has reached, which all relate to nonprison settings, must be weighed accordingly. Friedman testified that as a result of studies conducted by himself and other authoritative researches [6] it was his view that, after controlling for income, education and other relevant factors, the level of population density does not correlate to levels of crime committed; aggressive behavior, physical health or performance ability. Nevertheless, while these conclusions might suggest an impact of crowding on life considerably less than is commonly believed—and Professor Friedman described his findings as "counter intuitive"—their force is negated not only by the fact that none of the studies (including his own) have been made in a prison setting, but even more by the careful limits which he set on his own findings. Although Friedman testified that population density *per se* does not have negative effects he adhered to the significant qualification of that proposition set forth in his book *Crowding & Behavior:*

". . . high density [crowding] does not have generally negative effects on humans. . . . high density *does* have effects on people, but these effects depend on other factors in the situation." (Emphasis added)

More particularly, it was Friedman's conclusion that:

"If it is the kind of experience that would ordinarily be fun, in which the interactions among people are usually pleasant,

---

**6.** Professor Friedman specifically referred to J. Lawrence, *Science and Sentiment: Overview of Research on Crowding and Human Behavior,* 81:10 Psychological Bulletin 712 (1974); R. E. Mitchell, *Some Social Implications of High-Density Housing,* 36 American Sociological Review 18 (1971); A. Booth and J. Cowell, *The Effects of Crowding Upon Health,* paper presented at the American Population Association Meeting, New York 1974.

crowding usually has either no effect or actually enhances the enjoyment. On the other hand, if the situation would ordinarily be difficult for one reason or another and the interaction among the people is unpleasant, crowding will usually make things even worse . . . Crowding intensifies the normal reaction—making a bad experience worse and a good experience better." (p. 93)

\* \* \* \* \* \*

"When the social situation is bad, when people feel cut off, defensive, afraid, and suspicious, high population density will aggravate the already bad situation." (p. 121)

Moreover, the finding, at page 87 of *Crowding & Behavior* that:

"All-male groups respond negatively to crowding, becoming more competitive, somewhat more severe in their sentences, and liking the other members of the group and the whole experience less in a crowded condition."

when added to the earlier quotations appears to support rather than refute the conclusion that life at BXHD will be rendered more burdensome by crowding.

Finally, it is worth noting that Professor Friedman agreed that frustration increases the possibility of aggression, and that competition in a jail for limited resources, such as showers, toilets, telephones, would be a source of such frustration.

Dr. Susan Saegert, like Professor Friedman, is a student of the effect of crowding on human behavior. Although her career is not as long as Friedman's she is presently Assistant Professor of Environmental Psychology at the Graduate Center of the City University of New York, has written articles and delivered papers on the subject of crowding, and has acted as a consultant to the Port of New York Authority as to staggered work hours and residential density.

While Dr. Saegert differed with certain findings of Professor Friedman, she agreed with his theory that crowding intensifies the quality of an experience, and applying the theory to the BXHD dorms, which she had visited the day before the trial, concluded that increased population density would intensify detainee hostility, aggressiveness or withdrawal. She contrasted her own studies and those of others as to "real-life" situations (that is, research as to people in their natural settings, occupations or situations) with that of Professor Friedman and his colleagues in which the subjects were observed only in a "laboratory" experiment. Moreover, Dr. Saegert's studies relate to an increased population within a given space (the prototype of jail crowding) whereas Friedman has studied the obverse: decreasing space for a stable population.

From her work Dr. Saegert concludes that the introduction of increased population in a fixed space results at some point in what she termed "social overload," that is, a condition in which there are too many people for comfortable, habitual relationships. In such circumstances, it follows that:

1) with more people, there is a greater interaction and, as a consequence, more possibility of misunderstanding;

2) this negative result is aggravated in a closed setting such as jail or prison where:

(a) the interactions are between strangers,

(b) the turnover of group members is rapid and constant,

(c) the resident subjects spend *all* their time and

(d) there is a complete lack of privacy (as in dormitories), so that the possibility of being observed, being spoken to or being criticized is inescapable.

She supported this conclusion by reference to studies which found that students housed in dormitories were more likely to "withdraw" than those living in separate rooms; research done as to prisoners by Paul Paulus[7] in Texas which established that a greater number of complaints of

7. G. McCain, V. Cox and P. Paulus, *The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment.*

physical illness was made by those in dormitories than those in cells, and Navy findings that the greater the number of persons aboard ship the greater rate of medical complaints per person.

In contrast to Professor Friedman, Dr. Saegert concluded that no studies have *not* found psychological reactions to crowding.

### Findings of Fact

The ultimate fact to be determined in the unchartered area which has been explored is whether increased population in jail or prison dormitories produces consequence so burdensome to its residents as to deprive them of due process or to constitute cruel and unusual punishment,[8] and, if so, at what ratio of inmates to available space this occurs.

The record before us presents difficulties in reaching an answer, because with one exception none of the testimony purported to deal with such a novel issue except in a general manner. The statements of fact witnesses, whether for the plaintiffs or the defendants, were, perhaps unavoidably, subjective, superficial (because of the necessarily limited knowledge of the subject which each of them had) and, accordingly, unilluminating. If we were restricted to their views of the picture, no dependable answer could be given to the question posed.

The testimony of the experts was considerably more useful, though even there, as is normal, some opinions cancelled out others, and some were not truly to the point. For example, Silver's opinions on the basis of his experience as an architect are of little value in determining the issue, since he had never studied the effect of increasing population within a limited space, and in any event, such conclusions as he offered in support of defendants' position were diluted by the concrete fact that the Federal Metropolitan Correctional Center in New York, which he helped to design, provides incomparably more space per inmate than that proposed even by the plaintiffs in this case.

The testimony of Professor Friedman and Dr. Saegert largely offset that of the other. Yet Dr. Saegert's was the more persuasive, not only because of the qualifications which Professor Friedman applied to his own findings, but because of certain positive aspects of Dr. Saegert's statement. These include the fact that her opinions were derived from "real life" situations (what in the entertainment world would be described as research done "on location") as distinct from Professor Friedman's "laboratory" research, and the support for her views to be found in studies of the effects of population density in colleges, the Navy and a prison, limited as those studies are.

The sole witness who was knowledgeable as to the effects of population density in *prison* was Donald Goff. As a career penologist whose opinions were based on personal experience as well as standards of minimum space per prisoner established by such an authoritative body as The American Correctional Association measured against the standards of various states, his conclusions that the ACA standard of 75 sq. ft. per man is the minimally acceptable standard are entitled to substantial weight.

Moreover, Goff's views are supported by the space standards established by other penal agencies not cited by him in his testimony but which are facts of which we take judicial notice. These include National Sheriffs' Association, Handbook on Jail Architecture (1975) 62–63 (single occupancy detention rooms should average 70–80 feet); National Sheriffs' Association, Manual on Jail Administration, (1970) 39 (suggests 55 sq. ft. of space per bed and 10 ft. ceiling height in a 25 bed dormitory); National Council on Crime and Delinquency Model Act for the Protection of Rights of Prisoners (1972) § 1(b) ("providing for not less than fifty square feet of floor space in any confined sleeping area"); Report of the

---

8. Although there is doubt as to the applicability of the Eighth Amendment to unconvicted detainees, a detainee is "entitled to protection from cruel and unusual punishment as a matter of due process and, where relevant, equal protection." *Rhem v. Malcolm*, 507 F.2d 333, 337 (2d Cir. 1974), aff'g, 371 F.Supp. 594, 623–24 & n. 5 (S.D.N.Y.1974).

Special Civilian Committee for the study of the United States Army Confinement System, 7, 8, 125, 126, 127, 128, 129, 130, 131 (1970) (the Army standard in 1969 and to which the Army adheres was 55 square feet per prisoner).[9]

■ On the basis of all the testimony, we find as facts that:

1. There is a point at which the increase of population in limited space in a jail or prison setting produces consequences so burdensome on its residents as to deprive them of constitutional rights.

2. In the dormitories at the Bronx House of Detention the number beyond which such burden is imposed is approximately 29, the number of detainees which can be housed at the ACA standard of 75 sq. ft. per inmate and a number which compares reasonably to the rated capacity of 24 for the BXHD dormitories.

### The Law

■ The preliminary injunction sought by plaintiffs may be granted if, but only if, they establish that it is probable that they will succeed on the merits of the case, and that they will be irreparably injured if no injunctive relief is granted. *Stecher-Traung-Schmidt Corporation v. Self, et al.,* 529 F.2d 567, 568 (2d Cir. 1976).

■ We may put aside quickly the question of irreparable harm, for if the level of population in BXHD dormitories amounts to unconstitutional overcrowding, it follows inexorably that plaintiffs are being harmed irreparably:

"[t]he continuing daily deprivation of constitutional rights to minimal physical conditions of custody . . . is irreparable by definition." *Benjamin v. Malcolm,* 75 Civ. 3073 (S.D.N.Y. July 11, 1975).

The issue is therefore reduced to the question whether plaintiffs will probably succeed on the merits. We believe that they will.

The foundations of decision are articulated in two recent opinions of the Court of Appeals for this Circuit. In *Rhem v. Malcolm* the court stated, as to the general rights of detainees:

"The demands of . . . due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent necessary than to assure appearance at trial and security of the jail." *Rhem v. Malcolm,* 507 F.2d 333, 336 (2d Cir. 1974).

and in *Valvano v. Malcolm, supra,* the court observed, as to the very question of prison overcrowding:

"Overcrowding alone in pre-trial detention facilities above rated capacities has . . . been held to create a restrictive and deplorable living environment constituting an intolerable violation of the detainees' constitutional rights. *Taylor v. Sterrett,* 344 F.Supp. 411 (N.D.Tex.1972), *aff'd in part, rev'd in part,* 499 F.2d 367 (5th Cir. 1974); *Hamilton v. Love, supra, Jones v. Wittenberg,* 323 F.Supp. 93 and 330 F.Supp. 707, 714 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972); *Hamilton v. Schiro,* 338 F.Supp. 1016 (E.D.La.1970)." 520 F.2d at 398.

Although *Valvano* addressed itself solely to the question of the constitutionality of placing two men in a cell, and not as to standards of dormitory housing, it is significant that the touchstone of unconstitutionality described is "rated capacity," and the reference in the cited paragraph does not stand alone in the opinion. Earlier (at 395) the court explicitly describes "the rated capacity of BHD," and later (at 399) cites in support of its conclusion that the constitution demands limits on prison space per man "cases [which] were addressed [solely] to the reduction of jail population in excess of rated capacities" and in which "single cell occupancy was not litigated".

■ This specified reliance on rated capacity as the fundament by which the con-

---

**9.** The square footage in all these standards refer to sleeping space. The guidelines contemplate additional footage for "living" space.

stitutionality of minimal prison space per man is to be judged may not be ignored; and those other courts which have dealt with the issue have abided by the same standard.

Indeed, although *Valvano* dealt only with the constitutionality of double celling, the decision, at fn. 6, suggests the applicability of rated capacity as the judgmental criterion for dormitories as well, citing DeBeaumont and deTocqueville's early classic study *On the Penitentiary System in the United States and Its Application in France* (1833) that:

". . . we have seen in the house of arrest in New York (Bridewell) more than fifty indicted persons *in one room.* These arrested persons are precisely those for whom well-regulated prisons ought to have been built. It is easy in fact to conceive, that he who has not yet been pronounced guilty, and he who has committed but a crime or misdemeanour comparatively slight ought to be surrounded by much greater protection than such as are more advanced in crime, and whose guilt has been acknowledged.

"Arrested persons are sometimes innocent and always supposed to be so. How is it that we should suffer them to find in the prison a corruption which they did not bring with them.

"If they are guilty, why place them first in a house of arrest, fitted to corrupt them still more, except to reform them afterwards in a penitentiary, to which they will be sent after their conviction.

"There is evidently a deficiency in a prison system which offers anomalies of this kind." (At p. 49.) (emphasis added)

The Second Circuit's view is not unique. For example, in *Taylor v. Sterrett,* 344 F.Supp. 411 (N.D.Texas 1972), the court ruled on the constitutionality of space per prisoner in cells and "tanks." Referring to the "rated capacity" of such spaces, the court ordered the sheriff ". . . not to place more inmates in cells and tanks than those facilities are designed to accommodate." 344 F.Supp. at 413. In *Hamilton v. Schiro,* 338 F.Supp. 1016 (D.C.E.D.La.1970)

dormitories designed for 40 men were holding 60–80, and the entire jail was overcrowded. The court decreed that prison population be ". . . limited immediately and without delay to a maximum of no more than 450 inmates . . ." (its rated capacity). *Hamilton v. Landrieu,* 351 F.Supp. 549, 551 (E.D.La.1972). In *Miller v. Carson, supra,* the court emphasized that the jail was ". . . constructed to house a maximum of 432 inmates," 401 F.Supp. at 873, and directed that population be reduced to that number, which had been significantly exceeded. (Order and Preliminary Injunction of January 31, 1975, ¶ III(2), 401 F.Supp. at 899). The court entered a joint order in *James v. Wallace, supra,* and *McCray v. Sullivan, supra,* "enjoining the defendants from accepting any new prisoners, except escapees and parole violators, into [the] institutions until the population in each is reduced to design capacity." 406 F.Supp. at 322.

In light of the emphatic statement of the Court of Appeals in *Valvano* that prison overcrowding is unconstitutional, its unqualified use of rated capacity as the standard of determination, and the consistent views of other courts, it is manifest that defendants may not house detainees in the dormitories at BXHD in numbers significantly in excess of its rated capacity. Certainly this is true where, as here, the defendants have presented no evidence as to why the capacity set by the defendants themselves—or their predecessors—should not control, subject only to such variation as the record of this case may justify.

Minor variation of such a character is to be found in the testimony of Donald Goff. While of the view that rated capacity is ordinarily the criterion by which adequacy of prison living and sleeping space is to be judged, Goff acknowledged that the amount of such space (75 sq. ft. per man) declared minimal by American Correctional Association standards was acceptable. In the case of Bronx House of Detention the application of the ACA norm would limit population in a single dormitory to approximately 29 men. We conclude that the

plaintiffs will probably succeed in proving at trial that such a number is the maximum which may constitutionally be housed in BXHD dormitories, and we find that plaintiffs are suffering irreparable injury at present by defendants' failure to meet such limitations.

For the reasons stated plaintiffs' motion for a preliminary injunction is granted to the extent of restraining defendants from housing more than 29 men in any single dormitory at BXHD.

Submit order on notice.